## PANHANDLE EASTERN PIPE LINE CO. *v.* PUBLIC SERVICE COMMISSION OF INDIANA ET AL.

No. 69. Argued November 14, 17, 1947.—Decided December 15, 1947.

508

*John S. L. Yost* argued the cause for appellant. With him on the brief were *Ira Lloyd Letts* and *Alan W. Boyd.*

*Karl J. Stipher,* Deputy Attorney General of Indiana, argued the cause for the Public Service Commission of Indiana, appellee. With him on the brief were *Cleon H. Foust,* Attorney General, *Frank E. Coughlin,* First Deputy Attorney General, and *Urban C. Stover.*

*William P. Evans* argued the cause for the Indiana Gas & Water Co. et al., appellees. With him on the brief were *John C. Lawyer, R. Stanley Anderson, Wm. A. McClellan, Robert R. Batton, Carl E. Hartley* and *John E. Fell.*

*Frederick G. Hamley* and *John E. Benton* filed a brief for the National Association of Railroad and Utilities Commissioners, as *amicus curiae,* in support of appellees.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Broadly the question is whether Indiana has power to regulate sales of natural gas made by an interstate

pipe-line carrier direct to industrial consumers in Indiana. More narrowly we are asked to decide whether the commerce clause, Const. Art. I, § 8, by its own force forbids the appellee, Public Service Commission, to require appellant to file tariffs, rules and regulations, annual reports, etc., as steps in a comprehensive plan of regulation preliminary to possible exercise of jurisdiction over rates and service in such sales.[1]

Panhandle Eastern transports natural gas from Texas and Kansas fields into and across intervening states, including Indiana, to Ohio and Michigan. In Indiana it furnishes gas to local public utility distributing companies and municipalities. These in turn supply the needs of over 112,000 residential, commercial and industrial consumers.

Since 1942 appellant also has sold gas in large amounts direct to Anchor-Hocking Glass Corporation for industrial consumption.[2] Shortly before beginning this service appellant had informed a number of its customers, local distributing companies in Indiana, that it intended to render service directly to large industrial consumers wherever possible.[3] Pursuant to that policy, since these pro-

---

[1] The Commission is authorized to take these steps by Indiana statutes creating the state's regulatory scheme for public utilities. Burns Ind. Stat. Ann. §§ 54–101 *et seq.*

[2] Appellant's sales to Anchor-Hocking are far larger than sales made to several of the local distributing companies. Thus, in 1943 appellant sold 1,150,279 cubic feet to Anchor-Hocking and only 151,065 cubic feet to the local utility served from the same branch line. See note 8 *infra.*

[3] This was in 1941. In 1943 the chairman of appellant's board stated that "Panhandle was anxious to take over such business because it was unregulated transaction both as to the Federal Power Commission and the Public Service Commission of Indiana and that he intended to establish higher industrial rates based on a competitive fuel basis."

510

ceedings began direct service has been extended to another big industrial user.[4]

In 1944 the Commission initiated hearings relative to direct service by Panhandle Eastern to Indiana consumers. It concluded that "the distribution in Indiana by Panhandle of natural gas direct to consumers is subject to regulation by this Commission under the laws of this state," notwithstanding any alleged contrary effect of the commerce clause upon appellant's direct sales to industrial users. Accordingly it issued its order of November 21, 1945, for the filing of tariffs, etc., as has been stated.

Early in 1946 Panhandle Eastern brought this suit in a state court to set aside and enjoin enforcement of the order. While the cause was pending the Commission issued a supplemental order declining appellant's offer to submit the specified tariffs, reports, etc., "as information only," and reasserting its full regulatory power as conferred by the Indiana statutes.[5] 63 P. U. R. (N. S.) 309.

The trial court vacated the orders and enjoined the Commission from enforcing them. It accepted appellant's view of the effect of the commerce clause on its

[4] Prior to the hearings before the Commission appellant had entered into arrangements to provide direct industrial service to an E. I. DuPont de Nemours & Company plant near Fortville, Indiana. That service was commenced subsequent to the hearings.

[5] In the trial court the Commission had urged, as it still does, that its first order merely required the filing of information and that no action would lie to contest its power to fix rates or otherwise regulate the sales until that power was exercised. This resulted in bringing forth appellant's tender of compliance as "information only," conditioned upon the Commission's acceptance of the filing as such and without prejudice to appellant's right to contest the validity of any subsequent order. The supplemental order expressly stated that the filing, if any, would be deemed to be for the purpose of and available for use by the Commission in carrying out its further duties under the statute.

operations. The Supreme Court of Indiana reversed that judgment and denied the relief appellant sought. 224 Ind. 662. It held first that the Commission's orders amounted to an unequivocal assertion of power to regulate rates and service on appellant's direct industrial sales and thus presented squarely the question of the Commission's jurisdiction over such sales as affected by the commerce clause. The court did not flatly hold that the sales are in interstate rather than intrastate commerce. But, taking them to be of the former kind, it held them nevertheless subject to the state's power of regulation under the doctrine of *Cooley* v. *Board of Wardens*, 12 How. 299. The court further held that appellant, in making these sales, is a public utility within the meaning and application of the state's regulatory statutes, Burns Ind. Stat. Ann. §§ 54–105 and Ind. Acts 1945, c. 53, p. 110. It is this decision we have to review pursuant to § 237 of the Judicial Code, 28 U. S. C. 344 (a).[6]

The effect of the state statutes, whether permitting the filing of the tariffs, etc., as information unrelated to further regulation or requiring the filing as initial and integral steps in the regulatory scheme, and thus as presenting at the threshold of the scheme's application the question of the state's power to go further with it, is primarily a question of construction for the state courts to determine. In view of the Commission's position, as construed by the state supreme court, we cannot say that the only thing presently involved is the state's power to require the filing of information without reference to its further use for controlling these sales. Cf. *Arkansas Louisiana Gas Co.* v. *Department of Public Utilities,* 304 U. S. 61. Here

[6] Several of the local utility companies, which had been intervenors in the proceedings before the Commission, were permitted to intervene in the court test of the orders and are appellees here. The National Association of Railroad and Utilities Commissioners has filed a brief *amicus curiae* in support of the Commission's position.

the orders constituted "an unequivocal assertion of power" to regulate rates and service. Indeed they involve something more than a mere threat to apply the regulatory plan in its later phases. They represent the actual application of that plan in its initial stage. In such a situation appellant was not required to await a further regulatory order before contesting the Commission's jurisdiction. Cf. *Public Utilities Comm'n* v. *Gas Co.*, 317 U. S. 456.

This does not mean that we now express opinion concerning the validity of any further order which the Commission may enter. No such order is before us. It does mean that we are required to decide whether the sales in question lie within the scope of the state's power to regulate rates and service, so that some further order in those respects may or may not be entered.

Nor do we question that these sales are interstate transactions. The contrary suggestion left open in the state supreme court's treatment rests upon the view that gas transported interstate takes on the character of a commodity which has come to rest or broken bulk when it leaves the main transmission line and, under reduced pressure, enters branch lines or laterals irrevocably on its way to final distribution or consumption. Those merely mechanical considerations are no longer effective, if ever they were exclusively, to determine for regulatory purposes the interstate or intrastate character of the continuous movement and resulting sales we have here.[7]

---

[7] In *Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498, 504, the Court referred to earlier decisions turned by "applying this mechanical test for determining when interstate commerce ends and intrastate commerce begins," namely, "upon the introduction of the gas into the service pipes of the distributor," and then stated: "In other cases, the Court, in determining the validity of state regulations, has been less concerned to find a point in time and space where the interstate commerce in gas ends and intrastate commerce begins, and

Thus gas furnished to local utilities for resale is supplied unquestionably, both as to transportation and as to sale, in interstate commerce. Yet it is subjected to practically identical changes in pressure with the gas sold by appellant directly for industrial use.[8] Neither practical common sense nor constitutional sense would tolerate holding that reduction in pressure makes the industrial sales to Anchor-Hocking wholly intrastate for purposes of local regulation while deliveries at similar pressures to utility companies remain exclusively interstate. Variations in main pressure are not the criterion of the states' regulatory powers under the commerce clause. Cf. *Interstate Gas Co.* v. *Power Comm'n,* 331 U. S. 682, 689. The sales here were clearly in interstate commerce.

The controlling issues therefore are two: (1) Has Congress, by enacting the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717, in effect forbidden the states to regulate such sales as those appellant makes directly to industrial

has looked to the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce. Cf. *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 185, 187, *et seq.; California* v. *Thompson,* 313 U. S. 109, 113, 114; *Duckworth* v. *Arkansas* [314 U. S.], p. 390." 314 U. S. at 505.

[8] Appellant's gas enters Indiana in a 22-inch main at a pressure of 250 pounds or more per square inch. In the state the gas enters a 16-inch branch line at a pressure of 200 pounds per square inch, and then a 6-inch lateral line at a pressure of 100 pounds per square inch. In the lateral line the gas is transported to two adjacent meter houses. From one house gas is delivered to Anchor-Hocking at pressures as low as 10 pounds per square inch, while from the other deliveries are made to a local distributing company at pressures ranging from 9 to 25 pounds per square inch.

Similarly, gas from other laterals stemming from appellant's main line is reduced to a pressure of 16 pounds per square inch before being furnished to the DuPont plant and to pressures of approximately 20 pounds per square inch for two utility companies served from the same lateral as the DuPont plant.

consumers; (2) if not, are those sales of such a nature, as related to the *Cooley* formula, that the commerce clause of its own force forbids the states to act.

We think there can be no doubt of the answer to be given to each of these questions, namely, that the states are competent to regulate the sales. The two questions may best be considered in the background of the legislative history of the Natural Gas Act and of the judicial history leading to its enactment in 1938.

Prior to that time this Court in a series of decisions had dealt with various situations arising from state efforts to regulate the sale of imported natural gas. The story has been adequately told [9] and we do not stop to review it again or attempt reconciliation of all the decisions or their groundings. Suffice it to say that by 1938 the Court had delineated broadly between the area of permissible state control and that in which the states could not intrude. The former included interstate direct sales to local consumers, as exemplified in *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23; the latter, service interstate to local distributing companies for resale, as held in *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, reinforced by *Public Utilities Comm'n* v. *Attleboro Co.,* 273 U. S. 83.

Shortly then, as the decisions stood in 1938, the states could regulate sales direct to consumers, even though made by an interstate pipe-line carrier. This was true of sales not only for domestic and commercial uses but also for industrial consumption, at any rate whenever the interstate carrier engaged in distribution for all of these

---

[9] For a summary of the leading decisions concerning the sale and transportation of gas prior to the passage of the Natural Gas Act, see *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 504–505. See also Powell, Note, Physics and Law—Commerce in Gas and Electricity, 58 Harv. L. Rev. 1072; Howard, Gas and Electricity in Interstate Commerce, 18 Minn. L. Rev. 611.

uses.[10]   On the other hand, sales for resale, usually to local distributing companies, were beyond the reach of state power, regardless of the character of ultimate use.   This fact not only prevented the states from regulating those sales but also seriously handicapped them in making effective regulation of sales within their authority.[11]

[10] Appellant contends that "wholesale," *i. e.*, large quantity, service direct to industrial consumers, as exemplified by its sales to Anchor-Hocking, is to be distinguished from the sales in *Pennsylvania Gas Co.* v. *Public Service Comm'n*, 252 U. S. 23, which were made in a manner commonly associated with a local distribution system supplying gas to consumers in a city.   Nothing in the decision, however, requires it to be so limited.   On the contrary, emphasis may rather be placed on the fact that both situations involve sales to ultimate consumers, Anchor-Hocking being just as clearly in that category as the "factories and residences" served by the company in the *Pennsylvania Gas Co.* case.   See *Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498, 505, where Chief Justice Stone, in summarizing the *Pennsylvania Gas Co.* case, stated that it involved gas "sold directly to ultimate local consumers"; *Jersey Central Co.* v. *Power Comm'n*, 319 U. S. 61, 78, 80 (dissenting opinion) ; Powell, Note, 58 Harv. L. Rev. 1072, 1082, quoted *infra* note 12.

[11] The *Attleboro* decision, 273 U. S. 83, had been made in the face of the Rhode Island Commission's finding that the Narragansett company in selling electric current interstate to the Attleboro company was suffering an operating loss while the rates to its other customers yielded a fair return; and over the Commission's contentions grounded on that finding that it could not effectively regulate rates of the Narragansett company to its local consumers without also regulating its rates to the Attleboro company.

Compare the memorandum submitted on behalf of the National Association of Railroad and Utilities Commissioners by its general solicitor, Mr. John E. Benton, Hearing before Committee on Interstate and Foreign Commerce on H. R. 4008, 75th Cong., 1st Sess. 141, 143: "Sales for industrial use ought not to be exempt from all regulation, for the result may very well be that unjustifiable discrimination will result, and there will be no commission to which complaint may be made.   Sales for industrial uses plainly ought to be subject to regulation by the same Commission which regulates sales to other classes of consumers, so that just and reasonable rates, for the several classes of service, properly related to each other, may be established."

516

This impotence of the states to act in relation to sales for resale by interstate carriers brought about the demand for federal regulation and Congress' response in the Natural Gas Act. To reach those sales and prevent the hiatus in regulation their immunity caused, the Act declared in § 1 (b):

> "The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

This section determines the Act's coverage and does so in the light of the situation existing at the time. Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act "shall not apply *to any other . . . sale . . . .*" (Emphasis added.) Those words plainly mean that the Act shall not apply to any sales other than sales "for resale for ultimate public consumption for domestic, com-

mercial, industrial, or any other use." Direct sales for consumptive use of whatever sort were excluded.

The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions were made in either category for particular uses, quantities or otherwise. And the line drawn was that one at which the decisions had arrived in distributing regulatory power before the Act was passed.[12]

Moreover, this unusual legislative precision was not employed with any view to relieving or exempting any segment of the industry from regulation. The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions.[13] The Act was drawn with meticulous re-

---

[12] ". . . [T]he Supreme Court has from the beginning allowed the state both to tax and to fix the price on the first sale or delivery of gas or electricity brought in from a sister state when and if this first sale is also necessarily the last sale because consummated by consumption." Powell, Note, 58 Harv. L. Rev. 1072, 1082.

[13] In H. R. Rep. No. 709, 75th Cong., 1st Sess., the Committee on Interstate and Foreign Commerce said of the proposed bill which became the Natural Gas Act: "It confers jurisdiction upon the Federal Power Commission over the transportation of natural gas in interstate commerce, and the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use. The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co.* v. *Public Service Commission* (1920), 252 U. S. 23.) There is no intention in enacting the present legislation to disturb the

518

gard for the continued exercise of state power, not to handicap or dilute it in any way. This appears not merely from the situation which led to its adoption and the legislative history, including the committee reports in Congress cited above, but most plainly from the history of § 1 (b) in respect to the changes which took place in reaching its final form.[14]

States in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See *Missouri v. Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Utilities Commission v. Attleboro Steam & Electric Co.* (1927) 273 U. S. 83.) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act."

See also H. R. Rep. No. 2651, 74th Cong., 2d Sess. 1–3; Sen. Rep. No. 1162, 75th Cong., 1st Sess.

[14] In the hearings on H. R. 4008, the bill in the 75th Congress, the representative of several large pipe-line companies construed § 1 (b) as it then stood to exempt sales to industrial consumers from all regulation, state as well as federal, and proposed an amendment exempting sales for resale, when for industrial use only, from regulation under the proposed legislation. Hearing before Committee on Interstate and Foreign Commerce on H. R. 4008, 75th Cong., 1st Sess., 124. In an answering memorandum, Mr. Benton pointed out the pipe-line representative's misunderstanding of the purposes of § 1 (b), stating that "Service to an industrial user is just as much a local service . . . as is a sale to a householder for domestic use" and until "Congress occupies the field, a sale for industrial use is accordingly subject to State regulation . . . ." *Id.* at 143. He proposed an alternative amendment to render it clear beyond doubt that federal regulation of sales for resale extended to transactions where the gas was to be used for industrial purposes only. *Id.* at 142. Mr. Benton's amendment was adopted by the House committee and appears in substantially unaltered form in § 1 (b) of the Natural Gas Act as finally enacted. In H. R. Rep. No. 709, 75th Cong., 1st Sess., the

It would be an exceedingly incongruous result if a statute so motivated, designed and shaped to bring about more effective regulation, and particularly more effective state regulation, were construed in the teeth of those objects, and the import of its wording as well, to cut down regulatory power and to do so in a manner making the states less capable of regulation than before the statute's adoption. Yet this, in effect, is what appellant asks us to do. For the essence of its position, apart from standing directly on the commerce clause, is that Congress by enacting the Natural Gas Act has "occupied the field," *i. e.*, the entire field open to federal regulation, and thus has relieved its direct industrial sales of any subordination to state control.

The exact opposite is the fact. Congress, it is true, occupied a field. But it was meticulous to take in only territory which this Court had held the states could not reach.[15] That area did not include direct consumer sales, whether for industrial or other uses. Those sales had been regulated by the states and the regulation had been repeatedly sustained. In no instance reaching this Court had it been stricken down.[16]

It is true that no case came here involving state regulation of direct industrial sales wholly apart from sales for other uses. In the cases sustaining state power,

committee emphasized that Mr. Benton and other representatives of state commissions and municipalities appeared in support of the bill.

In support of its position appellant relies in part on H. R. Rep. No. 800, 80th Cong., 1st Sess., favorably reporting H. R. 4051 amending the Natural Gas Act. This bill did not become law. The views expressed in the committee report made in 1947, some nine years after the Natural Gas Act's passage, are hardly determinative or, in juxtaposition with the contemporaneous history, persuasive of the congressional intent in passing that Act.

[15] See notes 12 and 13 *supra*.

[16] *Ibid.*

whether to regulate or to tax, the company making the industrial sales was selling also to domestic and commercial users.[17] But there was no suggestion, certainly no decision, that a different result would follow if only direct industrial sales were being made. Neither the prior judicial line nor the statutory line was drawn between kinds of use or on the relation between sales for different uses. Both lines were drawn between sales for use, of whatever kind, and sales for resale. Cf. *Colorado Interstate Co.* v. *Comm'n,* 324 U. S. 581, 595–596.

The Natural Gas Act created an articulate legislative program based on a clear recognition of the respective responsibilities of the federal and state regulatory agencies. It does not contemplate ineffective regulation at either level. We have emphasized repeatedly that Congress meant to create a comprehensive and effective regulatory scheme, complementary in its operation to those of the states and in no manner usurping their authority. *Public Utilities Comm'n* v. *Gas Co.,* 317 U. S. 456, 467; *Power Comm'n* v. *Hope Gas Co.,* 320 U. S. 591, 609–610; *Interstate Gas Co.* v. *Power Comm'n,* 331 U. S. 682, 690. And, as was pointed out in *Power Comm'n* v. *Hope Gas Co., supra* at 610, "the primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies." The scheme was one of cooperative action[18] between federal and state agencies.

---

[17] *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23, appears to be the only case flatly ruling the point for regulatory purposes. But its authority was clearly recognized in *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 505, cf. note 10 *supra; Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 308; *Public Utilities Comm'n* v. *Attleboro Co.,* 273 U. S. 83, 87, and other cases, as well as in the congressional report quoted in note 13.

[18] The jurisdiction granted the Federal Power Commission by the Natural Gas Act necessitates close correlation with state regulatory bodies. Section 17 of the Act provides for cooperation between the federal and state agencies. See note 23 and text.

It could accomplish neither that protective aim nor the comprehensive and effective dual regulation Congress had in mind, if those companies could divert at will all or the cream of their business to unregulated industrial uses.[19]

The Natural Gas Act therefore was not merely ineffective to exclude the sales now in question from state control. Rather both its policy and its terms confirm that control. More than "silence" of Congress is involved. The declaration, though not identical in terms with the one made by the McCarran Act, 59 Stat. 33, 15 U. S. C. § 1011, concerning continued state regulation of the insurance business, is in effect equally clear, in view of the Act's historical setting, legislative history and objects, to show intention for the states to continue with regulation where Congress has not expressly taken over. Cf. *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408. Congress has undoubted power to define the distribution of power over interstate commerce. *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 769, and authorities cited; cf. *Prudential Ins. Co.* v. *Benjamin, supra.* Here the power has been exercised in a manner wholly inconsistent with exclusion of state authority over the sales in question.

Congress' action moreover was an unequivocal recognition of the vital interests of the states and their people, consumers and industry alike, in the regulation of rates and service. Indiana's interest in appellant's direct sales is obvious. That interest is certainly not less than the

---

[19] Over 38 per cent of the gross revenues of the local Indiana utilities from the sale of gas is derived from service to the approximately 250 industrial consumers served by them. If service to any substantial number of the industrial users were to be taken over by appellant, the local utilities not only would suffer great losses in revenue, but would be unable to dispense with more than a trivial percentage of their plant properties. The resultant increase in unit cost of gas would lead necessarily to increased rates for the consumers served by the local companies.

interest of California and her people in their protection against the evil effects of wholly unregulated sale of insurance interstate. *Robertson* v. *California,* 328 U. S. 440. Not only would industrial consumers in most instances go without protection as to rates and service other than that supplied by competition from other fuels,[20] but the state's regulatory system would be crippled and the efforts of the Indiana Commission seriously hampered in protecting the interests of other classes of users equally if not more important.[21]

As against these vital local interests, becoming more important with every passing year in the steady transition from use of more primitive fuels to natural gas and fuel oils, appellant seeks to set up its own interest in complete freedom from regulation and, if any is to be imposed, a supposed national interest in uniform regulation. The national interest, considered apart from its own, is largely illusory on this record. For itself, the company asserts that state regulation of prices and service will amount to a power of blocking the commerce or impeding its free flow.

There are two answers. One is experience. Insofar as this phase of the natural gas industry has been subjected to state regulation to date, those effects have not been shown to occur. The other answer, in case that experience should vary, is the power of Congress to correct abuses in regulation if and when they appear. State

---

[20] Pipe-line service, by the very physical conditions characterizing the industry and magnitude of investment required, acquires large monopolistic effects, more particularly in marketing areas distant from producing ones. Cf. *Power Comm'n* v. *Hope Gas Co.,* 320 U. S. 591, 610, n. 17 and text. Most often its competition is with other fuels rather than competing pipe lines.

[21] See note 19. Cf. *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346; *Robertson* v. *California,* 328 U. S. 440, 448; *Industrial Gas Co.* v. *Public Utilities Comm'n of Ohio,* 135 Ohio St. 408, 412; *Re Service Gas Co.,* 15 P. U. R. (N. S.) 202.

power to regulate interstate commerce, wherever it exists, is not the power to destroy it, unless Congress has expressly so provided.[22]  It is the power to require that it be done on terms reasonably related to the necessity for protecting the local interests on which the power rests.

Appellant also envisages conflicting regulations by the commissions of the various states its main pipe line serves, particularly in relation to curtailment of service when weather conditions or others require it, and fears conflict also between the state commissions and the Federal Power Commission.  It assigns these possibilities in support of its view that national uniform regulation alone is appropriate to its operations.  There is no evidence thus far of substantial conflict in either respect [23] and we do not see that the probability of serious conflict is so strong as to outweigh the vital local interests to which we have referred requiring regulation by the states.  Moreover, if such conflict should develop, the matter of interrupting service is one largely related, as appellees say, to transportation and thus within the jurisdiction of the Federal Power Commission to control, in accommodation of any conflicting interests among various states.[24]

These considerations all would lead to the conclusion that the states are not made powerless to regulate the sales in question by any supposed necessity for uniform

[22] *Kentucky Whip & Collar Co.* v. *Illinois Cent. R. Co.,* 299 U. S. 334; *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311; *United States* v. *Darby,* 312 U. S. 100.

[23] There is no evidence of any conflict in the asserted exercise of jurisdiction by the appellee Commission with any functions of the Federal Power Commission.  In granting appellant permission under § 7 (c) of the Natural Gas Act to extend its facilities to serve the DuPont plant, see note 4 *supra,* the Federal Power Commission specifically provided that the order was "without prejudice to the authority of the Indiana Commission in the exercise of any jurisdiction which it may have over the sale or service proposed to be rendered by Panhandle Eastern to du Pont."  Cf. note 18.

[24] See note 23.

524

national regulation but that on the contrary the matter is of such high local import as to justify their control, even if Congress had remained wholly silent and given no indication of its intent that state regulation should be effective. But in this case, in addition to those considerations taken independently, the policy which we think Congress has clearly delineated for permitting and supporting state regulation removes any necessity for determining the effect of the commerce clause independently of action by Congress and taken as operative in its silence.

The attractive gap which appellant has envisioned in the coordinate schemes of regulation is a mirage. The judgment of the Supreme Court of Indiana is

*Affirmed.*

Mr. Justice Jackson concurs in the result.

Mr. Justice Murphy took no part in the consideration or decision of this case.