123 So.2d 172

**STATE of Alabama**

v.

**TRANSCONTINENTAL GAS PIPE LINE
CORPORATION.**

**3 Div. 865.**

Supreme Court of Alabama.

Jan. 14, 1960.

Rehearing Denied Sept. 15, 1960.

MacDonald Gallion, Atty. Gen., Guy
Sparks, Special Asst. Atty. Gen., and Wm.
H. Burton, Asst. Atty. Gen., for appellant.

Johnston, McCall & Johnston and Samuel M. Johnston, Mobile, and Cabaniss & Johnston and E. T. Brown, Jr., Birmingham, for appellee.

SIMPSON, Justice.

The State Department of Revenue made an assessment for franchise taxes under the provisions of Sec. 348, Title 51, Code of 1940, as amended, covering the tax year 1956 against Transcontinental Gas Pipe Line Corporation, a corporation. From this final assessment the appellee appealed to the Circuit Court of Montgomery County, Alabama, in Equity, under the provisions of Title 51, Sec. 140, Code of Alabama of 1940. The case was submitted in the lower court on the bill of complaint and answer; a written stipulation and agreed statement of facts and exhibits thereto; the testimony of one witness and the oral arguments and briefs filed by counsel. From the final decree rendered in favor of Transcontinental Gas Pipe Line Corporation the State prosecutes this appeal.

The facts as found by the trial court are as follows: Appellee was in 1956 and prior thereto a corporation organized under the laws of Delaware. It was in 1956, and at all times has been, a natural gas company in interstate commerce within the meaning of the Act of Congress known as the Natural Gas Act, 15 U.S.C.A. §§ 717–717w, and subject to the jurisdiction of the Federal Power Commission, operating in Alabama and other states solely under certificates of public convenience and necessity issued by the Federal Power Commission. Appellee has never sought certificates of public convenience and necessity from, or approval of its rates and tariffs by, the State of Alabama or any other state, and the state of Alabama has never asserted any regulatory authority or jurisdiction over any of its rates or practices.

During 1956 appellee owned and operated an interstate natural gas transmission system extending approximately 3,087 miles from sources of gas supply in Texas and Louisiana through the States of Mississippi,

Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Pennsylvania, and New Jersey to a terminus at New York City. Some 353 miles of this pipeline were located in Alabama.

As the gas transported by the appellee moved through the interstate transmission line, its pressure was gradually lost by friction, requiring the use of compressor stations located at intervals to increase the pressure so that the gas would continue to move. Three compressor stations were owned and operated by appellee in Alabama in 1956. Each compressor station was comprised of several buildings and facilities. At each appellee used gas from its main pipeline as fuel for compressor engines and for heating offices, shops and warehouse facilities and houses. The appellee used gas from its main lines to provide fuel for engines which generated electricity which was also used at its stations. It procured water from rivers, creeks, etc. close to each station in Alabama. It maintained one or more large tanks at each station for water for domestic and personal use at all buildings which were a part of the station, and at two of the stations maintained tanks for water necessary for the operation of the station.

In order to assure the operation of each compressor station, it was necessary for trained persons to be readily available for duty at all times. For this purpose appellee maintained houses at the various stations and required that the superintendent and repair foreman of each station occupy a house. The other houses were occupied by persons highly skilled in the operation of the station. The houses at the stations were occupied by employees of appellee who paid rent of $40 a month which was less than the annual depreciation. The appellee furnished without charge to each house electricity generated by it and gas and water from the domestic supply.

The order of the Federal Power Commission granting appellee its certificate of public convenience and necessity provided that "Transcontinental is authorized to transport and sell natural gas in interstate commerce" to certain companies and communities, including some in Alabama, and that "Transcontinental shall not transport or sell natural gas to or for any customer except as authorized herein". From time to time the F.P.C. ordered appellee to serve additional municipal corporations in Alabama. During 1956 appellee sold gas in Alabama to no person, firm or corporation except thirteen municipalities. The sale of gas to each was pursuant to and in conformity with orders of the F.P.C. entered in response to petitions of the purchasers or their official representatives seeking mandates directing the sales, and facilities used for deliveries were constructed pursuant to and in conformity with orders of the F.P.C. Orders of the F.P.C. forbade the delivery by appellee of gas to the buyer at a pressure less than 50 pounds per square inch gauge. At no time was gas delivered at a pressure less than 50 pounds per square inch gauge, but was always delivered at a pressure substantially higher than 50 pounds per square inch gauge. In order to be usable it was necessary to reduce the pressure substantially from the pressure at which it was delivered by appellee.

During 1956 appellee owned and operated 12 meter stations designed to measure gas delivered to municipalities located in Alabama. Every meter station was as near the main pipeline as prudent engineering, reasonable accessibility and accepted safety practices would permit. All but three of such meter stations were within 100 feet of the pipeline, and the remaining ones were within 210 feet. All facilities to the point of delivery were owned by appellee. All facilities after the point of delivery were owned by the purchaser.

The gas purchased in 1956 by each municipal corporation in Alabama was purchased primarily for resale with small quantities of it being used and consumed by each purchaser. No municipal corporation used more than 2% of the gas purchased.

It was necessary for each municipality purchasing gas from appellee to reduce the pressure of the gas below the pressure at delivery before using it or reselling it.

All other activity of appellee in 1956 was found by the trial court to be an integral and necessary part of either the construction or maintenance of its interstate transmission system. It maintained an integrated VHF mobile and microwave radio-telephone communication system in this regard; it rented buildings to house work equipment; it rented for approximately two weeks a small office in connection with its authorized construction; it stored pipe which was used in the construction; it maintained small bank accounts in each of four banks in Alabama in connection with the construction of its transportation system.

In 1952 the F.P.C. at the instance of appellee and Southern Natural Gas Company, a Delaware corporation, issued certificates of public convenience and necessity to each corporation authorizing Southern and appellee to construct and operate facilities for the exchange or sale or delivery of natural gas between Southern's pipeline system and appellee's pipeline system. These facilities were, in the language of the F.P.C. order "proposed to be used in the transportation and sale of natural gas for resale in interstate commerce". The two companies entered into contracts whereby each agreed to sell or buy gas from the other. During 1956 appellee sold no gas to Southern in Alabama. During the period from May 17, 1956 and ending May 19, 1956, and the period beginning June 29, 1956 and ending June 30, 1956, Southern, pursuant to the aforesaid contract, sold gas to appellee in Alabama. Appellee purchased gas from Southern in May and June, 1956, due to a temporary shutdown of its transmission system west of Alabama on account of construction or relocation of its system. During these periods Southern sold appellee a total of 148,242 MCF of natural gas for which appellee paid

$31,068. All of the natural gas sold in Alabama in 1956 by Southern to appellee was produced in states other than the State of Alabama and brought into Alabama from such other states by Southern's pipeline system. The pressure of the gas was not reduced in the course of the delivery from Southern's system to appellee's system.

The trial court found that appellee has never maintained any general or corporate office in Alabama, nor has it any personnel located in this state who are authorized to solicit business, accept contracts for purchase or sale of gas, settle or adjust accounts, determine managerial policy, or otherwise perform management functions other than those relating solely to the operation, construction, and maintenance of its transmission system.

All records kept by appellee in Alabama during 1956 were found to be only those records pertaining to its interstate transmission system. All employees of appellee were those engaged solely and directly in the service of constructing, maintaining or operating its interstate system.

Appellee paid all ad valorem taxes assessed by proper state authorities on its property located in Alabama, income taxes to the State of Alabama on its net income allocated to business done in Alabama, sales or use taxes on all tangible personal property purchased or used in its interstate activities in Alabama, and unemployment compensation taxes with respect to its employees in Alabama.

The questions involved in this case are:

1. Does The Alabama Foreign Corporation Franchise Tax apply to a foreign corporation engaged solely in *interstate* commerce in Alabama?

2. If the tax is applicable to a foreign corporation doing solely an interstate business in this state, is it violative of the commerce clause of the Federal constitution?

3. Was Transcontinental Gas engaged solely in interstate commerce in Alabama in 1956?

■ The first of these questions has been answered in the negative in State v. Plantation Pipe Line Company, 265 Ala. 69, 89 So.2d 549, 560, where this court after reviewing the history of the Foreign Corporation Franchise Tax law of this state held:

"The Alabama franchise tax on foreign corporations is not applicable to foreign corporations doing an exclusively interstate business in Alabama."

There is no occasion, then, to consider anew the second question outlined above. It, too, has been answered in the Plantation case, supra.

■ This brings us to the primary issue in the case, and the one most strongly contested by the parties, the State contending that Transcontinental Gas Pipe Line Corporation was in fact doing an intra-state business in Alabama in 1956 and is therefore subject to the Foreign Corporations Franchise Tax. Appellee contends it engaged exclusively in an interstate business in Alabama in 1956 and is not subject to the tax. With respect to this issue the lower court concluded that Transcontinental was engaged solely in interstate commerce in Alabama in 1956. Every activity carried on by appellee was found by the trial court to be a necessary, inherent and integral part of the interstate transmission of natural gas or the construction of facilities for such transportation. The trial court was of the opinion that this case is controlled by the decision in the Plantation Pipe Line case, supra.

The facts of that case were summarized by the court as follows:

"Plantation Pipe Line Company is a corporation which was organized under the laws of the State of Delaware on July 8, 1940. * * *

"Plantation Pipe Line Company qualified to do business in Alabama in 1941. * * *

"Plantation Pipe Line Company has never filed nor sought approval of its rates and tariffs by the State of Alabama or any other state and the State of Alabama has never asserted any regulatory authority or jurisdiction over any of the rates or practices of the Plantation Pipe Line Company.

"During the year 1952 Plantation Pipe Line Company owned and operated a pipe line running from Baton Rouge, Louisiana, to Greensboro, North Carolina with lateral lines from Helena, Alabama, to Birmingham and Montgomery, Alabama, and from Bremen, Georgia, to Columbus and Macon, Georgia, and to Chattanooga and Knoxville, Tennessee. The length of the lines, with laterals, was approximately 1,968 miles, of which approximately 483 miles were located in Alabama. The total investment in carrier property, including construction work in progress as of January 1, 1952, was approximately $69,615,442.47 for the entire system and within the State of Alabama on the same date was approximately $17,095,063.34. * * *

"After the products are pumped into the pipe line at Baton Rouge, the flow gradually slows down as the product moves, requiring the use of pumps located at intervals to maintain the flow. Three pumping stations were operated in Alabama in 1952 with stand-by facilities at four points in the State of Alabama.

"Plantation Pipe Line Company had four delivery terminals in Alabama in 1952, at Moundville, Birmingham, Montgomery and Oxford. It did not make delivery of any products shipped through its pipe line at any point in Alabama other than at these terminals.

This was in conformity with its tariff. Plantation did not maintain any storage tanks at any delivery terminal or elsewhere in Alabama. As required by the tariff, shippers receive their products from the pipe line without delay. * *

"In order to assure uninterrupted operation of the pipe line, it is necessary that the person in charge of each pumping station and stand-by facility be on duty or on call at all times and for this purpose the company maintains at each station one house which it required the responsible employee to occupy and for which he is charged rent in an amount less than the annual depreciation and repairs.

"At each of the operating pumping stations there is a water tank primarily for fire protection. Water from the tank is never sold commercially but is used, incidentally and without charge, by employees at the pumping station and in the company house.

"The company maintains at Helena a warehouse where are stored maintenance materials for the operation of the pipe line. It also maintains a fire truck at Helena.

"Plantation Pipe Line Company had 82 employees in Alabama on January 1, 1952, and 68 on January 1, 1953. The only employees in Alabama in 1952 were those engaged solely and directly in the service of constructing, maintaining and operating the pipe line. The company had three trucks at Akron and a truck at Helena and Silver Run in 1952, which were used only to carry employees from place to place in connection with their work in the construction, maintenance and operation of the pipe line, to carry needed supplies and for other purposes directly connected with the construction, maintenance and operation of the pipe line.

"Some construction was carried on in 1952 by an independent contractor, consisting of enlarging the pumping facilities on the main lines. Similar work was done at Helena in 1951 and some clean-up work in connection with such construction was done at Helena in 1952.

"To keep its pipe line system in operation Plantation Pipe Line Company maintained by means of lines leased from others a communications system between its terminals, pumping stations, and its chief operating office in Atlanta. Plantation Pipe Line Company has never maintained any general or corporate office in Alabama. Its statutory domicile is and has been * * in Atlanta, Georgia. Plantation Pipe Line Company has never kept any records in Alabama except pumping station and terminal operating records necessary to the transportation of products received into the pipe line in Louisiana. It has never performed any functions in Alabama except those of constructing, maintaining and operating the pipe line." 265 Ala. at pages 74–76, 89 So.2d at pages 551–553.

This court held that Plantation was not doing local business in Alabama and was not subject to the Foreign Corporations Franchise Tax.

The State in this case contends that there are controlling factual differences between the Plantation case, supra, and the present case, and that these differences demand that a different result be reached. The appellee contends that there are no material differences between the facts of this case and those presented in the Plantation case. The trial court was of the opinion that the Plantation case was controlling, but went on to answer categorically the State's contentions. We, too, will consider them:

A. Does the fact that appellee reduced the pressure of the gas somewhat before delivery to the various municipalities to which it was sold constitute doing a local business in Alabama? Reduction in pressure before delivery was held not to change

the character of the company's interstate activities in Mississippi River Fuel Corporation v. Hoffman, 4 Ill.2d 468, 123 N.E.2d 503, certiorari denied Wright v. Mississippi River Fuel Corp., 349 U.S. 935, 75 S. Ct. 785, 99 L.Ed. 1264, and in Gay v. United Gas Pipe Line Company, 159 Fla. 659, 32 So.2d 600, where the gas was not produced in the taxing state. It should be remembered that although appellee reduced the pressure somewhat before delivery, it was necessary for the purchaser to further reduce it before it could be used or resold.

B. The State contends that the fact that some of the gas bought by the municipalities was consumed by the municipality (not more than 2% of the amount purchased by each) constitutes intrastate activity on the part of appellee. The sale and transportation of the gas is interstate commerce when furnished to local utilities for resale. Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128. The fact that a small percentage of the gas transported and sold by appellee was consumed by the purchaser does not change the nature of the act of selling and transporting. The transportation and sale, as we see it, is in interstate commerce under the decision in Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, supra.

C. The State contends that the fact that the company in the Plantation case was a common carrier while the appellee is not (the appellee transporting its own gas) dictates a different result in this case. The trial court was of the opinion, and we are agreed, that commerce is not limited to transportation. In the language of the trial court: "Persons transporting their own product, gas, which they sell, can be, and are, engaged exclusively in interstate commerce" citing Mississippi River Fuel Corporation v. Hoffman, supra; Texas Gas Transmission Corporation v. Atkins, 197 Tenn. 123, 270 S.W.2d 384, cert[iorari] de-

n[ied] 348 U.S. 883 [75 S.Ct. 125], 99 L.Ed. 694; Gay v. United Gas Pipe Line Company, supra; and Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, supra. It was held that gas companies transporting natural gas which they owned and which was sold to local utilities for resale, and to industrial customers for consumption, were engaged exclusively in interstate commerce.

We think there is no merit to the State's contention that the fact that appellee bought gas from Southern Natural Gas Corporation in 1956 constitutes doing a local business in this state. The trial court found that all the gas bought by appellee from Southern was produced in states other than Alabama; the pressure of the gas was not reduced before transmission to appellee's system and the interstate movement of it was never interrupted. We agree with the trial judge that Coverdale v. Arkansas-Louisiana Pipe Line Company, 1938, 303 U.S. 604, 58 S.Ct. 736, 82 L.Ed. 1043, is not controlling here, inasmuch as the gas in that case *was produced in the taxing state* and the incidence of the tax in that case is not the same as that involved here. We are dealing here with a tax based upon "doing a local business" in Alabama—there the tax was based upon the operation of prime movers.

We are of the opinion that the facts of this case indicate that appellee was engaged exclusively in interstate commerce in Alabama in 1956. Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573; Ozark Pipe Line Corporation v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439; United Air Lines, Inc. v. Joseph, 282 App.Div. 48, 121 N.Y.S.2d 692, affirmed 307 N.Y. 762, 121 N.E.2d 557.

We find no controlling difference between the facts here and the facts of the Plantation case, supra, decided by this court in 1956. We entertain the view, therefore, that the decision of the trial court was correct.

Affirmed.

**336**

LIVINGSTON, C. J., and GOODWYN and COLEMAN, JJ., concur.

## On Rehearing

SIMPSON, Justice.

At the earnest request of the ever zealous assistant attorney general, we postponed consideration of the State's application for rehearing, pending final disposition by the United States Circuit Court of Appeals (5th Circuit) of the cases of Ideal Cement Co., appellant v. United Gas Pipe Line Co., appellee (Scott Paper Co., appellant, v. United Gas Pipe Line Co., appellee), 282 F.2d 574.

The United States District Court, 176 F.Supp. 748 held that the taxable event in those cases was an intrastate transaction, and it was thought by appellant that these federal cases would be persuasive to grant the rehearing in the case at bar, should the Circuit Court of Appeals affirm. There were some factual differences between the United cases and TransCo, but we agreed to the postponement of action on the State's rehearing in the case at bar, pending the decision by the Circuit Court of Appeals.

The Circuit Court of Appeals on September 2, 1960 reversed the District Court, holding in effect that the transaction described in the United cases was interstate. The holding in these cases is, therefore, persuasive of the correctness of our holding in TransCo.

We therefore adhere to the holding of our original opinion and overrule the application for rehearing.

Opinion extended and rehearing denied.

LIVINGSTON, C. J., and GOODWYN and COLEMAN, JJ., concur.