In re Dewitt T. LANGFORD, D/B/A
Langford Oil & Gas Co., Debtor.

Philip I. HUDDLESTON, Trustee,
Plaintiff

v.

The EQUITABLE LIFE ASSURANCE
SOCIETY OF the UNITED
STATES, Defendant.

Bankruptcy No. 18000197.
Adv. No. 1810040.

United States Bankruptcy Court,
W.D. Kentucky.

Nov. 23, 1982.

John H. Helmers, Owensboro, Ky., for Equitable Life Assur. Soc. of U.S.

Philip I. Huddleston, Bowling Green, Ky., trustee in bankruptcy.

Henry H. Dickinson, Glasgow, Ky., for debtor.

## OPINION AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

Philip Huddleston, trustee in Chapter 11 for Langford Oil and Gas Co., seeks an injunction to compel Equitable Life Assurance Society to accept and transport, through pipelines owned by Equitable, natural gas produced by Langford. Equitable resists on due process and other grounds. The proceeding raises fundamental questions concerning the subject matter jurisdiction of this court in a dispute over the transportation of natural gas in interstate commerce.

\* \* \* \* \* \*

Dewitt Langford has been an entrepreneur in the natural gas industry in Kentucky for over sixty years in various capacities, personal and corporate. In 1976 Langford was conducting business as a sole proprietor under the name of Langford Oil and Gas Co., negotiating for leases in western Kentucky. He obtained various leases for gas wells in an area known to geologists as "the Shrewsbury Field," located primarily in Grayson and adjacent counties. The leases, according to the Chapter 11 petition and disclosure statement, are worth $6 million. Langford's 185 creditors, principally investors in his enterprise, are owed over $4.4 million.

While attracting investment capital and obtaining gas leases, Langford executed a contract to sell gas to be produced to Texas Gas Transmission Corporation, which has an interstate pipeline just south of the Shrewsbury Field in Bowling Green. There is no access pipeline to carry gas out of the field to the Texas Gas facility.

Equitable's history with Langford began in 1976 when it served as a financial backer for L & M (Langford and Moser) Oil and Gas Co., Inc.[1] to build a pipeline extending 23 miles from the Shrewsbury Field to Cromwell, where it connects with an interstate line owned by Midwestern Pipeline Company. Upon the financial failure of L & M Oil and Gas, Equitable instituted foreclosure proceedings and bought the pipeline at the resulting sale in December, 1979 for $5,750,000.

Eight months later Equitable was certified as a "small producer" [2] by the Federal Energy Regulatory Commission, and produces gas which it transports under contract to Midwestern Pipeline. Equitable is not licensed or certified in any way by the Public Service Commission of Kentucky, and has not been subject to state regulation as it produces and transports its natural gas across Kentucky to its interstate transmission agent, Midwestern.

Langford, trapped without a line of its own in the Shrewsbury Field and only 23 miles from a potential market, negotiated toward tapping into Equitable's existing pipeline through the field. Equitable refus-

---

1. L & M is one of the corporate forms earlier utilized by Langford. By 1976, after the loan from Equitable, Langford had a falling out with the other parties in control of L & M and was not active in the management of the company, but did remain a stockholder in the corporation. After the split with L & M, Langford began to conduct business as Langford Oil and Gas Co., the debtor in this case.

2. Equitable's present status is that assigned by the FERC pursuant to 18 C.F.R. 157.40, which defines a small producer as an independent producer that is not affiliated with a Class A natural gas pipeline on a nationwide basis and whose sales meet volume limitations during the calendar year.

ed.[3] It takes the position that its pipeline is privately owned and licensed to produce and transport only its own gas. Unable to forge an agreement, Langford now turns to this court to require Equitable to act as a transmission agent for Langford's gas.

\* \* \* \* \* \*

The procedural history of this dispute may be briefly summarized. An involuntary petition was filed against Langford on June 20, 1980. Langford subsequently converted the proceeding to a Chapter 11 reorganization and, at the request of creditors,[4] a trustee was appointed to manage the bankrupt estate.

On May 1, 1981 the trustee filed this proceeding, alleging that Equitable is an owner-operator of a line for the transportation of natural gas in Kentucky and, as a "common carrier" under KRS 278.470 and .490, is required to accept and transport the natural gas stored and produced by Langford.

Equitable, in its motion to dismiss, contends that the FERC has sole responsibility for regulating transportation of natural gas in interstate commerce, and that under applicable federal law Equitable has no duty to move Langford's gas.

\* \* \* \* \* \*

The issue raised by the pleadings is a fundamental one: Under either state or federal law, does this court have subject matter jurisdiction over this dispute?

First, as urged by the trustee, we examine state law to determine whether Equita-ble has a duty as a "common carrier" to receive and transport Langford's gas. Second, if state law does not apply, we must search applicable federal law for a right to connect to the Equitable pipeline.

■ Pertinent provisions of the Kentucky statute provide that:

"Every company receiving, transporting or delivering a supply of oil or natural gas for public consumption is declared to be a common carrier ... [and] ... shall at all reasonable times receive, for transportation and delivery, from such pipes as may be connected up with any main or tributary line, all oil or gas that may be held and stored or ready for delivery..."[5]

The Kentucky statute leaves us powerless to act. It applies only to companies engaged in the transportation of gas *"for public consumption"*—that is, for ultimate use by Kentucky consumers. Under that definition Equitable, which sells gas only to Midwestern Pipeline, is excluded from the statute's operation.

Our reading of the statute is in harmony with that of the state regulatory authority itself. The Kentucky PSC has never attempted to license, certify, or otherwise regulate Equitable, taking the position that it is the regulatory agency for local distributors only. A reviewing state court has agreed.[6]

■ The second possible jurisdictional basis of the claim is the Natural Gas Act of 1938.[7] The primary objective of that enact-

---

3. The history of their dealings may explain Equitable's refusal. Realistically, if Equitable could make a profit by accepting Langford gas, it presumably would do so, even restructuring their relationship, if need be, to meet FERC requirements. Equitable says it lacks the transmission capacity; Langford contends to the contrary. In either event, this limited aspect of the dispute plays no part in our decision.

4. Because of the nature and extent of their investment, it is the creditors, and not Langford personally, who are working toward a Chapter 11 plan to bring the wells into full production. In that respect, the case is, in this district at least, unique.

5. KRS 278.470 and .490.

6. The Public Service Commission adopted this limited authority stance in *Compressed Gas Co. v. L & M Oil Co.* (1979), affirmed Franklin Circuit Court (1981).

7. 15 U.S.C. § 717(b) provides as follows: "The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution or to the production or gathering of natural gas."

ment was to protect consumers against exploitation by natural gas companies[8] through comprehensive and cooperative dual regulation by federal and state agencies.[9] The congressional intent was to ensure a sufficient national supply of reasonably priced natural gas,[10] with the Act "so framed as to afford consumers a complete, permanent and effective bond of protection."[11]

The regulatory scheme devised by Congress sharply delineated between intrastate activities in the natural gas industry, to be regulated by the states, and interstate activities, to be assigned to a federal agency.[12]

Drawn within the sphere of federal control were "three things and three only.... These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale."[13]

The Supreme Court sustained the constitutionality of the Natural Gas Act in 1942,[14] and in a succession of later decisions accorded full respect to the congressional purposes of consumer protection[15] and federal dominance in the regulation of the interstate aspects of the industry.[16]

Federal preemption of the field is an expanding doctrine. The Supreme Court has observed that if "a problem ... is not, by its very nature, one with which state regulatory commissions can be expected to deal, the conclusion is unresistible that Congress desired regulation by federal authority rather than nonregulation."[17]

The litigation before us focuses on one of the three separate grants of federal power, the so-called "transportation" jurisdiction. "Transportation" has been interpreted to include such matters as the allocation and curtailment of gas supplies,[18] the quantities that pipelines may transport,[19] and other matters that would interrupt service.[20] De-

8. *Federal Power Com'n. v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944).

9. *Panhandle Eastern Pipeline Co. v. Public Service Com'n.*, 332 U.S. 507, 520, 68 S.Ct. 190, 197, 92 L.Ed. 128 (1947); H.Rep. No. 709, 75th Cong. 1st Sess., p. 2 (1937); H.Rep. No. 2651, 74th Cong., 2d Sess., pp. 1–3 (1936).

10. *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505 (1978); *Illinois Gas Co. v. Central Illinois Public Service Co.*, 314 U.S. 498, 506, 62 S.Ct. 384, 387, 86 L.Ed. 371 (1942); *Public Service Com'n. v. Federal Energy Regulatory Com'n.*, 610 F.2d 439 (6th Cir.1979).

11. *Atlantic Refining Co., v. Public Service Com'n.*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959). Those concerns which undergirded the 1938 Act are even more vital today, given the impact of the energy crises of the 1970s.

12. Initially regulatory power and functions were vested in the Federal Power Commission. With the creation of the Department of Energy in 1977, these functions were transferred to the Federal Energy Regulatory Commission, 91 Stat. 565.

13. *Panhandle Eastern Pipeline Co. v. Public Service Com'n.*, 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947).

14. *Federal Power Com'n. v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

15. *Federal Power Com'n. v. Hope Natural Gas Co.*, 320 U.S. 591, 611, 64 S.Ct. 281, 292, 88 L.Ed. 333 (1944); *Federal Power Com'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 631, 92 S.Ct. 1827, 1833, 32 L.Ed.2d 369 (1972).

16. *Interstate Natural Gas Co. v. Federal Power Com'n.*, 331 U.S. 682, 689–90, 67 S.Ct. 1482, 1486–87, 91 L.Ed. 1742 (1947); *Phillips Petroleum Co. v. State of Wisconsin*, 347 U.S. 672, 682–83, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954). For example, the Court has held that the states are unable to effectively regulate allocation of natural gas on a multistate basis because of the unavoidable conflict between producing and consuming states. *Federal Power Com'n. v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

17. *Federal Power Com'n. v. Transcontinental Pipeline Corp.* 365 U.S. 1, 28, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961).

18. *Federal Power Com'n. v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

19. Id.

20. Supra note 13.

cisions construing the scope of the transportation jurisdiction have broadly extended federal control, with our own Sixth Circuit Court of Appeals considering the interstate journey to begin even "at the wellhead." [21]

For us to hold that state law applies to this dispute—even if it provided a remedy—"we would have to repudiate a clear and compelling line of decisions to the contrary." [22] There is not even a question as to "whether state authority can practicably regulate;" [23] the Kentucky PSC has declined jurisdiction of the pipeline. And as the Sixth Circuit has observed, "[i]f practicable regulation exceeds the competence of the state governments, courts can preserve the efficacy of the Natural Gas Act only by determining that federal authority prevails." [24]

Thus far we are persuaded that (1) Kentucky law does not confer jurisdiction, and (2) even if a state-created right existed, it would yield to the preemptive federal power. We therefore conclude our inquiry exclusively within the framework of federal law.

There, too, we search in vain for power to entertain the trustee's complaint. Although Equitable is characterized as being in interstate commerce to bring it within the scheme of federal regulation, it is licensed *as a producer only,* and not as an interstate transporter.

The regulation under which Equitable is licensed provides that the company may engage only in the production, gathering and sale of natural gas *for resale* in interstate commerce, but *may not itself* engage in interstate transmission.[25] For this court to compel the acceptance of Langford gas would be to place Equitable in immediate violation of the regulation under which it operates.

In this connection the due process argument raised by Equitable is well taken. Not even the vast equity power of this court can be invoked to accomplish a "taking" of property rights in a way other than those prescribed by a comprehensive and specialized system of dual regulation.

We are forcefully reminded of another recent and more famous pipeline case, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and its provocative exploration of the doctrine of separation of powers. Although *Northern Pipeline* is only the most modern restatement of that admittedly arcane concept, it does serve to dissuade us from attempting to accomplish through judicial fiat that which may only be done, if at all, under executive order, whether state or federal.[26]

\*    \*    \*    \*    \*    \*

The case before us has been presented, argued and extensively briefed as though the issue is one of federal preemption. It is not.[27] The primal meaning of the preemption doctrine, as we understand it, is that in the event of irreconcilable conflict between the privileges and demands of state law and those of federal law, the latter must prevail. Here there is no such conflict. There is no judicial reme-

**21.** *Public Service Com'n v. FERC,* 610 F.2d at 444.

**22.** Id.

**23.** *Federal Power Com'n. v. Transcontinental Pipeline Co.,* 365 U.S. at 19, 81 S.Ct. at 445.

**24.** *Public Service Com'n. v. FERC,* 610 F.2d at 443.

**25.** 18 C.F.R. 154.91(a) defines an independent producer as one "... who is not engaged in the transportation of natural gas (other than gathering) by pipeline in interstate commerce."

**26.** By basing our decision on the lack of subject matter jurisdiction, we avoid unnecessary conflict with the executive power. We also settle another basic question, facially apparent but not addressed by the parties, which is whether we have *in personam* jurisdiction of Equitable.

**27.** Counsel for both parties, expert in the byzantine intricacies of energy regulation law and working with the zeal inspired by high stakes, have presented a case of confusion more apparent than real. On this point we are more understanding than critical.

dy available under either state or federal law.[28]

Our result, from Langford's viewpoint, might be characterized as creating an unintended "regulatory gap" in which Langford stands without protection. Nowhere in the regulatory scheme, however, do we find any entitlement to protection of an entrepreneurial effort still in an undeveloped stage.

Equitable has lines in place, Langford does not. That single difference explains their different treatment under law. With collecting, gathering and transmission capability, Langford could qualify for the same licensed status, and the same protection, enjoyed by Equitable. But in the meanwhile, the trustee's only and best resort is to the laws of economics that govern the free market.

For the reasons we have explained, the trustee's complaint is dismissed, with prejudice. This is a final order.

---

**28.** Our analysis of the subject-matter jurisdiction issue necessarily leads to the related but more substantive question of whether the trustee has a cause of action. We take that second step, holding that he is without remedy, to dissuade him from its further pursuit elsewhere in other courts, before the Kentucky PSC or the FERC, that would only be costly and unsuccessful.