463 F.2d 799
 149 U.S.App.D.C. 396, 94 P.U.R.3d 500
 MONSANTO COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, United Gas Pipe Line
Company, Intervenor.
MONSANTO COMPANY, a corporation, Appellant,
v.
UNITED GAS PIPE LINE COMPANY, a corporation, et al.
TEXAS GULF SULPHUR COMPANY, a corporation, Appellant,
v.
UNITED GAS PIPE LINE COMPANY, a corporation, et al.
 Nos. 71-1306, 72-1093 and 72-1094.
United States Court of Appeals,
 District of Columbia Circuit.
 Argued March 13, 1972.
 Decided April 19, 1972.
 
 Mr. John T. Miller, Jr., Washington, D. C., with whom Mr. James J. Bierbower, Washington, D. C., was on the brief, for petitioner in No. 71-1306 and appellants in Nos. 72-1093 and 72-1094.
 Mr. George W. McHenry, Atty., F. P. C., of the bar of the Supreme Court of Tenn., pro hac vice, by special leave of court, with whom Messrs. Gordon Gooch, Gen. Counsel, Leo E. Forquer, Solicitor, J. Richard Tiano, First Asst. Sol., and George P. Lewnes, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent in No. 71-1306 and intervenor-appellee Federal Power Commission in Nos. 72-1093 and 72-1094.
 Mr. W. DeVier Pierson, with whom Mr. Peter J. Levin, Washington, D. C., and William B. Cassin, Houston, Tex., were on the brief, for appellee United Gas Pipe Line Co. in Nos. 72-1093 and 72-1094 and intervenor in No. 71-1306.
 Mr. Christopher T. Boland, Washington, D. C., for intervenor-appellee Texas Gas Transmission Corp. in Nos. 72-1093 and 72-1094.
 Before LEVENTHAL and ROBB, Circuit Judges, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This court has before it consolidated appeals: A petition by Monsanto Company (No. 71-1306) to review an action of the Federal Power Commission, and appeals by both Monsanto (No. 72-1093) and Texas Gulf Sulphur Company (No. 72-1094) from a judgment of the District Court dismissing their contract actions brought against United Gas Pipe Line Company, on the ground that the matter involved is within the jurisdiction not of the court but of the Commission, which had intervened in the civil actions.
 
 I. BACKGROUND
 A. Underlying Facts
 
 2
 What has precipitated these controversies is the current shortage of field natural gas supply. While the shortage is general[1] we focus particularly on the fact that while United, a "natural gas company" under the Natural Gas Act (Act)[2], operates an interstate natural gas transmission pipeline, it does not--at least as of the present and recent past--have a supply of natural gas sufficient to meet the requirements of its customers. Monsanto and Texas Gulf Sulphur are industrial customers of United, buying for use, and not for resale. United's direct sales to these industrial customers are not subject to rate regulation under the Act, but sales of gas in interstate commerce to direct sales customers purchasing for use are subject to certificate regulation under Sec. 7 of the Act.
 
 
 3
 Monsanto buys natural gas from United under a long-term requirements contract, up to 65,000 Mcf per day, for use as both raw material and as boiler fuel in its Pensacola plant, alleged to be the largest unified nylon yarn plant in the world. The Commission issued an order pursuant to Sec. 7(c) of the Act, authorizing United to deliver up to 75,000 Mcf of gas daily to Monsanto, upon a finding that this was necessary and appropriate under the Act and required by the public convenience and necessity.[3] In the parlance of the industry, Monsanto has a "firm" contract rather than one of the "interruptible" contracts which essentially provide that the pipeline company may terminate delivery on short notice. The electric utility or other buyer in such interruptible contracts usually pays a lower price but is under the obvious necessity of installing alternative arrangements, permitting a ready conversion to say, residual fuel oil, as a source of boiler fuel. However, Article IX of the Monsanto-United contract,[4] like United's contracts with other direct industrial customers, makes certain provision for curtailment of supply in time of gas shortage, and an underlying controversy is whether United's actions are in accord with its contract obligations. Copies of United's contracts with its industrial customers are filed with the Commission pursuant to its regulations.[5]
 
 
 4
 B. Federal Power Commission Curtailment Proceeding
 
 
 5
 On October 26, 1970, United filed with the Commission a petition for declaratory order, concerning its curtailment program, described in the petition, to be initiated November 1, 1970, stating in substance: Because of the national gas shortage United will be obliged to curtail deliveries during the 1970-71 winter season, and to implement section 12 of its filed Tariff on curtailment of deliveries. Most customers have been understanding and cooperative, recognizing the shortage is national in scope and not a matter subject to United's control, that United's program is the most equitable under the circumstances, and also the program United is obliged to implement under the tariff provision and like provisions contained in all United's direct sales contracts. However, certain customers have expressed objections, which United deems without merit, "but the possible gravity of leaving these disputes unresolved has forced United to request that the Commission declare the curtailment plan described herein to be in keeping with the provisions of its filed tariff."
 
 
 6
 The final section of the petition went beyond the tariff (at least if that is taken to govern sales subject to rate regulation to reach industrial users). It recited that the orderly implementation of United's curtailment program "obviously requires the cooperation, voluntary or otherwise, of United's direct industrial customers." However, some customers say they do not intend to cooperate, and are not required to do so, under their contracts. United asked that the Commission's order also declare that its curtailment program "is in accordance with the provisions of its contracts for the sale of gas in interstate commerce with direct sales customers." United anticipated curtailment of deliveries only to customers in the industrial category.[6]
 
 
 7
 This petition of United was made the subject of FPC Docket No. RP71-29. The Commission gave public notice, and Monsanto timely intervened in opposition to the proposed curtailment program. It relied on its contract rights, challenged the claim that the curtailment program was equitable, and asserted, inter alia, that United's shortage, if any, may be due to its attachment of additional service obligations interfering with its obligation to serve its older, firm customers. On December 10, the Commission set the matter for public hearing on December 21, stating that the hearing was to resolve the question, inter alia, of whether it would constitute undue discrimination if United's curtailment program "did not apply equally to the jurisdictional and direct sales customers of United." The order pointed out that United had already placed its curtailment plan in effect and prompt hearings were necessary, and specified that United would present its entire case orally, followed by immediate cross-examination of United's witnesses.
 
 
 8
 At the hearing, before witnesses were presented, a recess was suggested to attempt to devise for the current winter a curtailment program satisfactory to all. After United put in its direct case orally, United's counsel read into the record an interim curtailment arrangement to which all of the parties ultimately agreed, with the exception of Monsanto. Essentially the arrangement was to accept United's plan, with these modifications--that United would attempt to purchase up to 300,000 Mcfd on an an emergency basis from non-jurisdictional sellers,[7] and that the customers would not seek injunctive relief or damages for any gas curtailments made prior to March 31, 1971.
 
 
 9
 The Examiner stated he would certify the proposal to the Commission for its consideration and recessed the hearing to resume January 12, 1971. On December 29, 1970, the Commission issued an order providing: "The interim compromise settlement as reflected in the record of December 22, 1970, is approved." Monsanto's petition to review, filed April 26, 1971, attacks that order, and also the order of February 26, 1971, denying Monsanto's application for rehearing. The Commission's motion to dismiss the petition for review or, alternatively, for summary affirmance, was denied by our order dated June 23, 1971.
 
 C. Action In District Court
 
 10
 Actions against United were filed in the U.S. District Court for the District of Columbia by Monsanto, October 8, 1971, and a month later by Texas Gulf Sulphur Company, also a direct sale industrial customer.
 
 Allegations of complaints
 
 11
 Plaintiffs brought these as contract actions, seeking damages and injunctive relief. They claimed their contract rights were impaired as to the past by United's curtailment program, put into effect November 1, 1970, both prior and subsequent to the FPC's approval of the settlement agreement.
 
 
 12
 They sought injunctive relief against future breaches of contract rights.
 
 
 13
 Plaintiffs' claims on the merits--which are only contentions, for there has been no proof--run in substance as follows:
 
 
 14
 The continued supply of United's gas service under their firm contracts is vital to plaintiffs.[8] While the contracts contain a force majeure curtailment provision, and a similar provision was inserted by United into its Tariff, for the case of "shortage of gas," this is inapplicable to excuse United's actions as consistent with the contracts because the so-called "shortage of gas" on United's system is due to "improvident attachment by United of additional markets." When pipeline companies undertake, as they have, to sell gas from general systems reserves to industrial customers contracting for a full-requirements firm gas supply, and making large investments in reliance thereon, the pipeline company is under the obligation of a fiduciary principle.[9] Plaintiffs contend that an analysis of United's activities since 1968, in the light of its inhouse supply-demand studies, show that United deliberately and prematurely exhausted the gas supplies it should have been husbanding to carry out its firm supply obligations, that it filed annual reports (on FPC Form 15) which deceived the FPC and public as well as United's customers, that at a time when it knew it was short of gas it filed new certificate applications, like its May 1970 application to sell to Mississippi River Transmission Corp., which resulted in new delivery of 51,721 Mcf per day beginning November 3, 1970, the day it began to curtail firm service on a continuous basis. Furthermore, United gave notice in 1971 that it would continue to enlarge its daily deliveries during 1971-1972--50,000 Mcf on direct industrial sales, and 200,000 Mcf on city gate deliveries--at the expense of the firm service it was already obligated to maintain.
 
 
 15
 Plaintiffs asked the court to compensate it for damages already sustained, to enjoin United from this threatened activity disabling it from meeting its contract obligations, and to require United to interrupt service commenced by United since the fall of 1968 with knowledge that its gas supplies did not permit this additional service without curtailing existing firm service.
 
 
 16
 Motions to Dismiss Actions As A Collateral Attack on FPC Proceedings
 
 
 17
 Motions to dismiss these actions were filed by United, and by the FPC and Texas Gas Transmission Corp. (which would be affected if United's "new" service were cut back) as intervenors. These motions asserted that the court was without jurisdiction of the controversy, which was a matter for the FPC, subject to review only in the courts of appeals, and that the actions were impermissible both as a collateral attack on the FPC's jurisdiction, and for failure to exhaust prescribed remedies before the FPC and the court of appeals.
 
 
 18
 These motions brought before the District Court the fact that in 1970 the FPC established a curtailment docket on United's application, FPC Docket No. RP 71-29, and the sequence therein of the interim settlement; the FPC's approval of December 29, 1970; Monsanto's petition to this court; and the FPC's issuance of opinion No. 606 on October 5, 1971, following the close of the evidentiary record and waiver of Hearing Examiner's decision. The FPC held therein that it had "plenary authority to allocate the gas supply of jurisdictional pipelines to all customers, including direct industrial users, regardless of any contracts with individual customers, direct or resale." By Opinion 606-A, December 3, 1971, the FPC denied rehearing and request for modification. We are informed that Opinion No. 606 is pending on review in the Fifth Circuit.[10]
 
 District Court's Dismissal
 
 19
 On January 4, 1972, the District Court orally announced its view that the matter "is within the jurisdiction of the Federal Power Commission rather than the jurisdiction of this court," that the Commission is authorized to regulate the transportation of gas in interstate commerce, and other just and reasonable practices and services of natural gas line companies. The order of dismissal was entered January 21, 1972.
 
 D. Subsequent Developments--Before FPC
 
 20
 We shall discuss under III the subsequent developments of a decision of the Fifth Circuit, issued January 14, 1972, and the granting of certiorari. Here we note merely that on January 15, 1972, appellant Texas Gulf Sulphur filed a petition with FPC for emergency relief--as permitted by FPC Opinion No. 606. It sought an order directing United to deliver 7,000 Mcf per day, and no less than 1,500 Mcf, pending a final order in the curtailment proceedings. This was granted in part by order of January 28, 1972, ordering United to deliver no less than 1,500 Mcf daily, in view of probable irreparable damage to plant facilities and the risk of loss of sulphur reserves. The FPC declined to order the 7,000 Mcf per day, sought on the ground that at lesser volumes the mine would be uneconomic to operate, on the ground that loss of revenues or profits is not the type of injury warranting extraordinary relief.
 
 
 21
 II. DISMISSAL OF MONSANTO'S PETITION TO REVIEW
 
 
 22
 We dismiss Monsanto's petition to review the FPC's action of December 29, 1970, approving the "interim settlement in the curtailment proceedings, without decision on the merits, for lack of aggrievement.
 
 
 23
 Monsanto's petition to review was bottomed on the hypothesis that the FPC's action would operate--unless contested--to affect Monsanto's legal rights, its rights against United in a contract action, and perhaps legal position in the final curtailment proceedings. On oral argument, Commission counsel represented that the FPC order had no legal effect other than to indicate that the FPC accepted the agreement of the parties. It was a kind of psycho-legal action, to induce maximum agreement and adherence. It was not intended as, and may not operate as, a preclusion or modification of the rights of Monsanto, which was not a party to the agreement.
 
 
 24
 The FPC's action is certainly not clear, and it is easy to understand why Monsanto appealed and why we declined to grant the FPC's pre-argument motion to dismiss. However, we are now satisfied that the submission of Commission counsel is a reasonable view of its action, we adopt it, it is now binding on the Commission, and that leaves no significant reason for maintenance of the appeal. Alton & Southern Ry. v. Int'l Ass'n of Machinists & A.W., 150 U.S.App.D.C. 36, 463 F.2d 872 (No. 24,217, April 11, 1972); Consumers Union v. Veterans Adminis., 436 F.2d 1363 (2d Cir. 1971). This action presents no cause for concern to Monsanto, whose counsel candidly stated, at argument, that he thought the case was moot, and hoped it was moot, but had filed a protective appeal to preserve Monsanto's position. This was entirely prudent, and since the FPC action was far from clear as to its limited consequence, our action dismissing this appeal will be without recovery of costs, each party to bear its own costs as already incurred.
 
 
 25
 III. REMAND TO DISTRICT COURT DOCKET OF CONTRACT ACTIONS
 
 AGAINST UNITED
 
 26
 In the other two appeals, we find that protection of the possible rights of appellants requires reversal of the District Court's judgment and remand of the actions to its docket.
 
 Fifth Circuit Decision
 
 27
 We preface our analysis with a reference to Louisiana Power & Light Co., et al. v. United Gas Pipe Line Company, et al., 456 F.2d 326 (5th Cir., 1972), cert. granted, with provisions for expedited consideration, sub nom., Federal Power Commission v. Louisiana Power & Light Co., 405 U.S. 973, 92 S.Ct. 1198, 31 L.Ed 2d 247 (March 6, 1972).
 
 
 28
 The Fifth Circuit's ruling came in an action begum by Louisiana Power & Light (LP&L) in district court in March 1971, while the United curtailment proceeding was pending before the FPC, seeking an injunction ordering United to deliver to LP&L the full amount provided for by LP&L's contract with United. The district court dismissed the action on the ground that the FPC has exclusive jurisdiction over United's curtailment program.[11] The Fifth Circuit reversed, holding that the FPC is without jurisdiction to order curtailment of gas deliveries to direct sales industrial customers, that it has jurisdiction under Sec. 7 of the Act to grant initial certificates of public convenience and necessity for such direct sales, and to authorize an abandonment of such sales, but that Congress has not granted it continuing jurisdiction, to modify or condition a certificate issued for facilities used to make a direct sale. It further held that the FPC's curtailment proceedings did not oust the district court of jurisdiction, and remanded with directions to the district court to expedite the disposition of the case on the merits.
 
 
 29
 In its petition for certiorari urging expedited review of the decision the FPC stressed that it had been deprived of jurisdiction to allocate gas transported by interstate pipelines among all consumers in a fair and equitable manner when gas shortages make full deliveries to all customers impossible. It submitted that the FPC has such jurisdiction over curtailments by interstate pipelines of natural gas deliveries to direct sales customers, and that while Sec. 1(b) restricts jurisdiction over sales to sales for resale, the Act applies without limitation to all transportation of gas in interstate commerce. The petition relied, inter alia, on Panhandle Eastern Pipe Line Co. v. Pub. Serv. Commn. of Indiana, 332 U.S. 507, 523, 68 S.Ct. 190, 92 L.Ed. 128 (1947); FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 28, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961); and the provision in Sec. 4(b) providing that no natural gas company shall, with respect to any transportation or sale subject to FPC jurisdiction, make any undue preference.
 
 Reasons for Remanding
 
 30
 to District Court Docket
 
 
 31
 While appreciation of the procedural context of this controversy has led to an opinion of perhaps excessive length, we think that the principles pertinent to our present action may be briefly stated and applied.
 
 
 32
 1. First, we conclude that the District Court should not have undertaken to make a decision one way or the other concerning the FPC's jurisdiction in the curtailment proceedings. In this respect, our decision diverges from both the Fifth Circuit's ruling, rooted in an approach that differed critically from that of the FPC, and the action of the District Court, rooted in an approach sustaining the authority of the FPC.
 
 
 33
 The authorities in this area of the law are by no means easy to reconcile. A statement of appropriate principle probably can do little more than indicate the factors that must be weighed. K. Davis, Administrative Law Treatise, Secs. 20.01-20.03.
 
 
 34
 The principal factor underlying our approach is our awareness that there is a great deal of merit to the FPC's claim of curtailment jurisdiction. In a case like this, where the parties may show irreparable injury in the event the agency proves to lack jurisdiction, a rough forecast as to jurisdiction, without decision, is a reasonable guide to the court's action. This is not unlike the rule that an equity court, in balancing the considerations on a request for preliminary injunction, often, and perhaps typically, must rest on a reflective, though preliminary appraisal of the merits.[12]
 
 
 35
 2. It is of course no bar to the decision to await the agency ruling that it will be a ruling on its own jurisdiction. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). This was, indeed, recognized by the Fifth Circuit in J. M. Huber Corp. v. Denman, 367 F.2d 104 (1966).
 
 
 36
 3. It counts against the complete abstention of the court that meanwhile the plaintiffs may be subject to irreparable injury. There are, however, offsetting and inter-related considerations. There is need to take into account possibility of irreparable damage to the public, if relief is wrongfully granted the complaining individual. Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937). While the particular cases of the industrial consumers may have equity the overall interest of the public--at least pending final determination--may also require consideration of the equities of others. Finally, there is the possibility, under Opinion 606 as issued, of administrative relief for exceptional cases, such as was granted in part to Texas Gulf Sulphur on January 28, 1972. Compare In re Permian Basin Area Rate Cases, 390 U.S. 747, 771, 88 S.Ct. 1344, 20 L.Ed.2d 312 et seq. (1968).
 
 
 37
 4. The court may retain jurisdiction of an action even while the agency is deciding whether and to what extent it has jurisdiction, and may grant temporary relief, while the agency is completing its consideration, in appropriate cases. For analogy, reference may be made to rulings under the supple doctrine of primary jurisdiction.[13]
 
 
 38
 5. Even where the case is more likely one of exhaustion of remedies, predicated on an assumption of agency jurisdiction, rather than primary jurisdiction, in which a court obtains the benefit of a consideration of a specialized agency that is only "advisory," there is sound doctrine for retention of the case on the docket. When the court perceives that there is no action whatever cognizable in court, it properly dismisses the action altogether.[14] But even when a case must await an inquiry that is within the jurisdiction and peculiar competence of the agency, it is properly held by the court pending the conclusion of the administrative proceeding when that is appropriate in order to preserve the legal position of the private party. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940).
 
 
 39
 The propriety of this course is fortified, for the case at bar, by the consideration that even assuming the FPC's curtailment jurisdiction is upheld, along the lines developed in its Opinion No. 606, it does not automatically follow that plaintiffs are lacking a contract remedy in damages. It is possible that the FPC may be held to have jurisdiction under Sec. 4(b), to prohibit unreasonable preferences in transportation, without relieving the pipeline company of liability for damages. That is to say, the industrial user may be able to say: Given the pickle created by the pipeline company, what the FPC did was lawful and proper as to actual subsequent rationing of the limited supply of gas, but the pipeline company is liable in damages because of the way it put us all in the pickle. And in the case at bar, there is a claim for damages sustained before the FPC issued an order. We do not decide this question, but only identify the problem. Certainly the problem is one that requires attentive consideration.
 
 
 40
 In No. 71-1306, the petition to review is dismissed. In No. 72-1093, 72-1094, the judgment of the District Court is vacated, and the cases remanded to the District Court, to remain on its docket, for further proceedings not inconsistent with the opinion of this court.
 
 
 41
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(c) (1970)
 
 
 [1]
 See Southern Louisiana Area Rate Cases v. F.P.C., 428 F.2d 407, 437 (5th Cir.) cert. denied, sub nom. Municipal Distributors Group v. FPC, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970)
 
 
 [2]
 The Natural Gas Act is codified at 15 U.S.C. Sec. 717 et seq. The definition of natural gas company appears in Sec. 2(b) of the Act, 15 U.S.C. Sec. 717a
 
 
 [3]
 United Gas Pipe Line Co., 34 FPC 892 (1965). This amended an earlier order authorizing delivery of up to 56,000 Mcf per day to the plant. United Gas Pipe Line Co., 24 FPC 216 (1960)
 
 
 [4]
 Article IX of the contract provides:
 Buyer specifically recognizes the fact that Seller delivers gas to gas utilities for resale to domestic consumers and to public utility power plants for generation of electricity which is sold to domestic consumers. In the event a shortage of gas renders Seller unable to supply the full gas requirements of all its consumers, then it is mutually agreed that the gas requirements of gas utilities selling gas to domestic consumers and public utility power plants using gas for generation of electricity which is sold to domestic customers shall first be supplied by Seller, and the remaining available gas shall be prorated by Seller among its other contract consumers, including Buyer.
 
 
 [5]
 Section 155.1 of the Regulations under the Natural Gas Act, 18 C.F.R., subchapter E, Part 155. See also Part 157. In United Gas Pipe Line Co. v. FPC, 86 U.S.App.D.C. 314, 181 F.2d 796 (1950), the court held that since the FPC's regulation, Order No. 144, requiring that rates be filed in tariff-schedule form, instead of as amendments to contracts as previously, had not been preceded by a quasijudicial proceeding at which evidence was presented, the court of appeals was without jurisdiction to entertain a petition for review under Sec. 19(b) of the Act
 
 
 [6]
 Section 12 of United's tariff establishes service priorities as follows: (1) gas used for industrial purposes; (2) gas burned to generate electricity used by domestic customers; (3) gas used by domestic consumers. In event of shortage, United curtailment would first be on a ratable basis in category (1); if all such deliveries had to be discontinued and a shortage still existed, curtailment would be ratably within (2), etc. Within category (1) United's petition proposed ratable reduction regardless of whether the gas was sold to industries by United, or by its pipeline customers, or by its city-gate customers, or was sold for the generation of electricity for industrial consumption
 
 
 [7]
 FPC's Order No. 418, Dec. 18, 1970, Docket R-404, 35 Fed.Reg. 19173 (1970) provides that in such emergency conditions non-jurisdiction field producers can sell to an interstate pipeline for up to a 60-day period, without thereby becoming subject to the jurisdiction of the FPC
 Monsanto contends this modification added nothing to United's prior duty to seek out all available supplies, and therefore the settlement agreement was only a onesided surrender of contract rights of users.
 
 
 [8]
 The pertinent allegations are these: Monsanto needs the gas at its Pensacola plant, both as raw material, and for energy, the cost of which is a critical item in an industry exposed to competition from both domestic and international sources. The plant began operations in 1953, and the FPC authorized the service (see note 3). While curtailments thus far have not interfered with the supply of gas (about 15%) purchased for process purposes, Monsanto's need to switch to oil supplies for fuel have increased fuel costs substantially ($476,000 for Nov. 1970-September 19, 1971), jeopardized its competitive position, and damaged Pensacola's economic stability due to reduction in number of employees at the plant
 Texas Gulf designed its Bully Camp Frasch Process Sulphur Mine entirely around the firm supply of natural gas, up to 10,100 Mcf per day, called for by its 20-year firm contract executed in 1967 with United. The mine is in Louisiana bayou country, accessible only by boats. Its process requires continuous large volumes of super-heated water injected into sulphur-bearing strata far below the surface. It was engineered for gas and cannot feasibly be converted to other fuels. At least 1500 Mcf per day is necessary to avoid destruction of the wells, and 7000 Mcf per day is needed for economic feasibility in operating the mine. Shutdown for economic reasons risks both the $10 million investment in the mine, because the facilities cannot practicably be salvaged, and the loss of the sulphur remaining in the underground formation, since it would not be economically feasible to reopen the mine.
 
 
 [9]
 Appellants rely e. g., on H. R. Williams, The Fiduciary Principle in the Law of Oil and Gas, 13th Oil & Gas Institute 201, 274 (S.W.Legal Fdn. 1962)
 
 
 [10]
 Louisiana Power & Light Co. et al. v. FPC, Fifth Cir. No. 71-3429, and other cases consolidated therewith
 
 
 [11]
 The court also dismissed LP&L's claim that the FPC lacked jurisdiction to issue a certificate of public convenience and necessity covering United's pipeline facilities used to make deliveries to one of its plants. A similar problem may arise with respect to Texas Gulf Sulphur, in view of the February 9, 1972, decision of the FPC in United Gas Pipe Line Co., FPC Docket No. CP 71-89, finding that a part of United's system, which had previously been regarded purely intrastate, had become jurisdictional by virtue of United's commingling of interstate gas within the system. The issue whether a certificate should issue authorizing the continuation of service to Texas Gulf Sulphur, inter alia, has been remanded to the Hearing Examiner
 We see no occasion to comment at this time on this certificate phase of FPC proceedings relating to United.
 
 
 [12]
 Delaware & Hudson Ry. Co. v. United Transportation Union, 450 F.2d 603, 619 (D.C.Cir. 1971); Mass. Ave. Heights Citizen Assn. v. Embassy Corp., 139 U.S. App.D.C. 355, 356, 433 F.2d 513, 514 (1970)
 
 
 [13]
 Wheelabrator Corp. v. Chafee, 147 U.S. App.D.C. 238, 455 F.2d 1306, (No. 24,705, Oct. 14, 1971); Brawner Building, Inc. v. Shehyn, 143 U.S.App.D.C. 125, 133-135, 442 F.2d 847, 855-857 (1971)
 
 
 [14]
 Montana-Dakota Utilities Co. v. Northwestern Public Serv. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951)