Dale LaROWE, John Kennedy, Robert Massey, Appellants-Intervenors,

v.

**KOKOMO GAS AND FUEL COMPANY, Appellee-Petitioner,**

and

Cabot Corporation, Appellee-Intervenor.

No. 2-476 A 155.

Court of Appeals of Indiana, Third District.

March 16, 1979.

Nelson G. Grills, Indianapolis, for appellants.

George P. Osborn, Thomas R. Hunt, Kiley, Osborn, Kiley, Harker & Rogers, Marion, Howard J. Cofield, Jon D. Noland, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for amicus curiae.

Joseph H. Davis, Lawrence R. Murrell, Fell, Davis & Murrell, Kokomo, George P. Osborn, Thomas R. Hunt, Kiley, Osborn, Kiley, Harker & Rogers, Marion, for appellees.

GARRARD, Judge.

Appellants, residential customers of appellee, the Kokomo Gas and Fuel Company (Kokomo), challenge two orders of the Public Service Commission (PSC). The orders (Cause Nos. 34471 and 34570) approved petitions filed by Kokomo seeking permission to purchase natural gas from a source other than its contract supplier in order to make up deficiencies in the amount of gas available from its supplier, and to assess the costs of the purchase among all classes of customers equally. Appellants do not challenge the purchases; they challenge the orders only insofar as they require residential customers to share in the cost. The Indiana Gas Company and 12 industries served by Kokomo have filed amicus briefs in support of the orders; one industry filed an intervenor brief.

Kokomo is a public utility serving approximately 26,700 customers in Cass, Howard, Tipton and Miami Counties. Panhandle Eastern Pipe Line Company is Kokomo's sole contract supplier. In 1971, Panhandle and other interstate suppliers began proceedings with the Federal Power Commission to determine how limited supplies of gas were to be allocated in view of the nationwide gas shortage. The FPC approved a curtailment plan for Panhandle,[1] the result of which was a decrease of 30% off base period volumes and 70% in the amount of gas it had contracted to supply Kokomo. However, Kokomo will receive enough gas to provide for residential customers in most instances; the purchases in issue here will be largely for consumption by other customers.

The FPC curtailments were made on the basis of the "end-use" of the supplier's gas. That is, the FPC determined that certain uses of natural gas by its ultimate consumers are of a higher priority than other uses, and those using the gas for the higher priority purposes should be the last to be curtailed. Allocations were made to distributors on that basis. Under the FPC priority system, residential customers have the highest priority; i. e., they are the last customers to be curtailed in the event of insufficient supply. A somewhat similar curtailment plan, established by Kokomo and approved by the PSC, provides that residential customers will be the last to be curtailed from the supply of gas available to Kokomo.

To avoid the necessity to invoke curtailments, Kokomo has at several points petitioned the PSC to purchase propane (substitute gas) and supplemental gas. The latter is natural gas purchased from an out-of-state supplier at a cost not regulated by the

1. Opinion No. 754, Docket No. RP 71–119 (Feb. 27, 1976) found in CCH *Utilities L. Rep.,* paragraph 11,779, p. 13,580. FPC Order 467 (found in *Pacific Gas & Electric Co. v. FPC* [1974], 164 U.S.App.D.C. 371, 506 F.2d 33 at 51) set forth the general policy of curtailment according to classes of customers, and was amended by Order 467–B, 49 FPC 583 (1973). Opinion No. 754 found that some of the distinctions created in Order 467–B were unjust and unreasonable, but did not deviate from the policy originally expressed in Order 467 and its amendment of according the residential class the highest priority. This is the critical factor in our references herein to 467, 467–B and Opinion No. 754.

FPC.[2] Both substitute and supplemental gas are more expensive than "pipeline" gas (FPC regulated gas supplied under the contract with Panhandle). At the time of these hearings, substitute gas was about 2½ times more expensive than supplemental gas which, in turn, was about twice as expensive as pipeline gas. Kokomo had already received PSC approval to purchase substitute gas when the opportunity arose to purchase supplemental gas at a considerable savings. Because gas rates are set by the PSC and reflect, in part, the cost of pipeline gas, Kokomo had to petition the PSC in order to make the purchase and to recover the difference between supplemental and pipeline gas costs from its customers. Partly because of its limited storage facilities,[3] Kokomo has had to make several petitions for purchase of specified amounts of gas over specified time periods at various prices. Kokomo intends to make future requests of a similar nature.

Appellants intervened in 3 of 4 petitions for the purchase of supplemental gas; they appeal from 2. Because the issues in both are nearly identical, the cases have been consolidated on appeal.

*Review of PSC Orders*

Three findings of the two orders are challenged. They are:

> *Finding 15, Cause No. 34471*
> "All sources of gas, including emergency purchases of supplemental gas, should be available on an equal basis to meet, to the extent possible, the existing demands of all firm customers. All sources of gas are commingled and no particular source of gas is dedicated to any customer or class of customers. If, as in the present situation of Petitioner, there is an insufficient total supply of gas to meet all such existing demands the most equitable method of curtailment would be on a pro rata basis among all customers. However, as a practical matter residential and small commercial customers cannot be required to install alternate fuel systems or reduce their daily and monthly usage to a specified percentage of historical usage. Rather, the required curtailment must by necessity fall upon the larger volume commercial and industrial customers who must bear the expense of providing alternate energy capability and regulate their gas usage within necessary limitations imposed. It is this pragmatic situation which is the basis of Petitioner's curtailment tariffs. The customer who is subject to curtailment is already bearing the costs of alternate fuel capability and facing reduced operating schedules, which could cause economic hardship and resulting loss of employment. The residential and small commercial customers are being benefited and protected by curtailment of these other customers. We find it would be inequitable and discriminatory to impose the total additional cost of supplemental supplies of gas solely upon the very class of customers who are already bearing the economic burden of curtailments. Although not specifically stated or discussed, this same issue has been inherent in all proceedings concerning supplemental gas and the allocation of the cost thereof, and in all such proceedings we have followed the same rationale as expressed above. To take an inconsistant [sic] position in this case would not only be irreconcileable [sic] with our previous findings in other supplemental gas proceedings, but would set a precedent we could very well live to regret in the future. There have been no distinguishing features in this case which would warrant a departure from our previous policy with regard to this issue or to warrant the establishment of a dangerous precedent."

---

**2.** The FPC regulates only "jurisdictional pipelines." FPC jurisdiction does not extend to the product of an interstate sale which is consumed entirely within one state. 15 U.S.C. § 717(c). While much is made by both parties of the jurisdiction of the FPC, they agree that if the "end-use" or consumption is wholly intrastate, the FPC has no authority over the sale.

**3.** In addition, the PSC orders approving each purchase have required Kokomo to petition again should it wish to buy additional supplemental gas.

*Finding 5, Cause No. 34750*

"Based upon projected monthly gas volume curtailment figures furnished to Petitioner by its pipe line supplier, there will not be sufficient natural gas supply to Petitioner for Petitioner to meet the requirements of its firm customers during the coming months. We find from the evidence heard in this cause that although residential service has not yet been curtailed as a result of the inadequate supply of natural gas, without the availability of substitute and/or supplemental gas, there would not be sufficient gas to serve the peak day demand of residential customers."

*Finding 14, Cause No. 34750*

"In our orders approved on November 26, 1975 in Cause # 34303 and March 24, 1976 in Cause # 34471, the Commission determined that the supplemental purchased gas adjustment factor should be applied to all service under each such schedule. Based on the evidence introduced in this proceeding, we again find that it is fair and equitable that Petitioner's excess cost of supplemental purchased gas be borne by all of Petitioner's customers, and it will be so ordered.

Throughout its history of operations, none of Petitioner's gas supply, whether it be manufactured gas, native Indiana gas, interstate gas, propane-air gas or supplemental gas, such as involved herein, has ever been dedicated to a particular class of customer. The total requirements of all customers have always been met from the total supply of gas available regardless of its source. This policy, which we firmly believe should be continued, increases the reliability of service to all customers.

FPC Order No. 467–B, which accords residential and small commercial service the highest priority, does not alter the above principle. That Order is directed only to the allocation of gas by interstate pipeline companies and does not control the actual end use of gas which is a subject for state commission regulation. Petitioner's curtailment plan, which curtails large industrial and commercial customers first, is based on the impracticality of curtailing residential customers, and it was approved by this Commission on that basis and not because of any determination that residential customers have an inherent, prior right to existing gas supplies, either under Order 467–B or for any other reason. Moreover as a result of curtailments, it is the large industrial customer who is already bearing the economic costs of the gas shortage and is receiving less reliable service. Accordingly, we find that it would be inequitable and discriminatory to impose the total additional cost of supplemental supplies solely upon that class of customer."

In their assignments of error, their briefs and reply briefs, appellants put forth a variety of challenges, centering on the sufficiency of the evidence to support the findings and their constitutionality. The thrust of these challenges stems from appellants' contention that while, by and large, the findings accurately depict past policy and practice, the priority plans have mandated a complete turnabout. Therefore, the findings cannot be supported by the evidence, and the rates resulting from them are unjust, unreasonable, and thus unconstitutional. Appellants maintain that the priority system has dictated the abandonment of the past policy which required granting all firm customers equal entitlement to all sources of gas available to Kokomo. Instead, the priority system has created a dedication of gas to the residential class. Since Panhandle can supply a sufficient volume of gas to meet residential demand, its gas is dedicated to that class alone. Therefore, residential customers should pay pipeline gas prices for whatever gas they actually receive. Because any supplemental gas purchases are made to avoid curtailing lower priority classes, only those who would be curtailed in the absence of such purchases should pay for them. Appellants continue that these purchases are solely for the benefit of lower priority customers, specifically industry, and any benefit that residential customers might receive is merely the result of Kokomo's correction of an under-supply which

the utility itself created by allowing lower priority customers to draw on gas earmarked for residential use in violation of both PSC and FPC curtailment policies.

Before considering these arguments, appellants make an additional challenge which should be disposed of.

### Reliance on Past Policy

In both appeals, appellants challenge the PSC's reliance on their past practice of "tracking" or "rolling in" the excess costs of supplemental gas purchases. These terms refer to allocating the cost to all customers rather than to the class for whose benefit the purchase is primarily made. While not clearly articulated in Finding 14, direct reference to this "past policy" was made in Finding 15 and seems, as well, to be implicit in the later order. In Finding 15, the Commission stated:

> "Although not specifically stated or discussed, this same issue has been inherent in all proceedings concerning supplemental gas and the allocation of the cost thereof, and in all such proceedings we have followed the same rationale . . . There have been no distinguishing features in this case which would warrant a departure from our previous policy or to warrant the establishment of a dangerous precedent."

Appellants contend that "previous policy" comes within the definition of "rule" under IC 4–22–2–3. That statute, which governs rule-making proceedings, excludes adjudications. The petitions filed by appellee and other utilities requesting permission to buy supplemental gas and to track its cost to all customers resulted in hearings or "controversial proceedings" in which the PSC had to act as "an impartial fact-finding body." IC 8–1–1–5. In illuminating that basis for its decision, the Commission properly referred to its prior resolution of similar issues. Of course, this does *not* mean that an issue of law thereby presented is beyond judicial review.

Additionally, it may be noted that a prior order, Cause No. 34303, was admitted into evidence without objection. That order contained language identical to the language complained of here and was challenged in appellants' brief filed before the PSC. Thus, basic concepts of notice and hearing implicit in IC 4–22–2–3 have been met by admission of the order without objection and the consideration of appellants' brief before the Commission.

### Sufficiency of Gas Available from Panhandle

Turning to the main issues in this case, the PSC found that there was insufficient pipeline gas to serve residential customers on peak days. Appellants argue that the supply from Panhandle is more than adequate to meet residential demand on peak or any other days. They point to the facts that Kokomo will receive 8,889,631 Mcf of gas from Panhandle for 1976–77, and that in 1975 Kokomo's sales to residential customers totaled approximately 4,000,000 Mcf[4] to show that more than enough pipeline gas will be available to provide for residential needs. However, simply comparing gross figures does not take into account the full circumstances or the practical problems confronting Kokomo.

First, there is a question of the accuracy of Panhandle's projections of available supply and the consumption patterns of Kokomo's customers. Panhandle's estimates of its ability to supply Kokomo's customers are based on past usage figures provided by Kokomo. The base period used to determine demand was 1969 to 1971. Panhandle's projections, therefore, assume future demand will be no greater than past demand. Thus, if Kokomo took no new residential customers from 1972–76 and the old customers did not increase their usage, there would be sufficient gas for them. Kokomo receives notice of curtailment one month in advance of the date Panhandle begins cutting back. Accordingly, there is

4. The figure of 4,000,000 is misleadingly low since Kokomo sold less gas in 1975 than it did in the preceding decade. Nonetheless, Panhandle was predicting in April 1976 that it could deliver sufficient gas to meet residential demand for 1976–77.

little lead time for Kokomo to begin either curtailments or negotiations for purchase or manufacture of other gas. Although Panhandle does send out quarterly statements of its estimates of available gas for the coming 12 month period, the estimates can vary between quarters. Curtailments instituted by Kokomo on the basis of an early projection could be ineffective to preserve pipeline gas for residents if the early projection was substantially greater than the later actual supply. Or the reverse could occur. That is, actual supply might exceed early projections. At the time these suits were filed, Kokomo had instituted firm customer curtailments only during two months. Had Kokomo instituted curtailments upon initial receipt of the Panhandle notice, non-residential customers would have paid more for more supplemental gas than was needed; their curtailment would have been unnecessary and, therefore, arguably arbitrary.

More important than the accuracy of the projections is the question of whether Kokomo could and should make all of the curtailed gas available to one class of customers. Kokomo receives daily supplies of gas from Panhandle. It does not receive its entire allotment at once. Its storage facilities do not begin to accommodate its allotment. During some months Kokomo receives more gas from Panhandle that it can use for residential purposes. The utility then has two choices. It can draw on the supply only to the extent that residential customers' needs are met in terms of use and storage, curtail all other customers, and let the rest of its allotment pass on down the pipeline to other Panhandle customers. The alternative is to draw on the pipeline up to the limit of its allotment and use that gas for all customers. Kokomo has chosen to do the latter. This allows it to take all the gas it is entitled to from Panhandle and provide all its customers with lower cost gas.

Reflected in this choice is the fact that Kokomo must pay two charges for pipeline gas: a demand charge which is a charge for the gas it is entitled to take under its contract with Panhandle, and a commodity charge, which is a charge for the gas actually taken. Kokomo pays the demand charge whether it actually takes the gas or not. In addition, historically, it has been common practice to maximize use of pipeline gas. Before the gas shortage, industries were encouraged to some extent to use gas during periods of excess pipeline supply so that the utility would not have to leave the gas on the pipeline. This increases the utility's revenues and, therefore, reduces the costs to individual customers because the expense of purchasing gas, as well as maintaining the entire system, is spread over more customers.

It is clear from the record that residential customers cannot be served on peak days if supplemental gas is not purchased for injection into storage unless industry is curtailed year around. What is not clear is whether Panhandle would have provided enough gas to Kokomo by the time of the winter heating season to effect the needed storage. We have not been given figures showing monthly volumes taken by residential users and the storage capacity to enable us to make that determination. Kokomo's practice of letting all firm customers draw on pipeline gas certainly appears to have created the situation that more gas is needed for injection into storage in order to serve peak day loads of residential customers. On the other hand, when asked if the utility could fill storage from pipeline gas by forcing its five largest industrial customers to provide for their own fuel, Kokomo's representative stated that the utility did not have the capacity to store the seven million feet of gas that comes over the pipeline each day. Regardless of how the deficit occurred, it exists and without the purchases in question, curtailment will have to move up to the residential customer level on peak days. While appellants can object to the reasons for the finding, it is supported by the evidence. The next question is whether the pipeline gas has or should have been dedicated to residential customers by virtue of the curtailment plans.

*Curtailment Plans*

While the challenge made to the finding of inadequate supply for residential users is

one of sufficiency of the evidence, appellants' real objection is not whether they will receive non-pipeline gas, but that they must pay a portion of the increased cost of non-pipeline gas. In arguing that supplemental gas is chargeable to industry, they concede that pipeline gas cannot be sequestered for their use alone. The crux of their argument is that whatever the source of the gas that is ultimately delivered to them, if the annual volume available from Panhandle is sufficient to meet residential demand projections, those customers should pay only pipeline rates, regardless of whether the pipeline gas is sufficient on any given day. Presumably they would also argue that if only a portion of their demand could be met from pipeline supplies, they should pay pipeline prices for that portion, again whether they receive that or other gas.

To support this argument, they point to the curtailment regulation approved by the PSC for Kokomo and the FPC curtailment regulations. They argue that the policies embodied in the regulations are contravened by requiring high priority users to pay the costs of supplemental gas. Stated simply, their argument is first, that Kokomo's regulation required curtailment as soon as a shortage was apparent and, therefore, it was intended that higher priority customers should pay only for the type of gas which the regulation attempted to assure would be supplied to them.

### Kokomo's Plan

Looking first to Kokomo's PSC-approved curtailment regulation, it can be seen that it does not envision mandatory curtailment as soon as a shortage is apparent. Before listing priorities, the regulation states:

> "When sufficient volumes of gas are not available to the Company to meet all existing and reasonably anticipated demands and to protect and replenish its gas storage reserves, the Company shall have the right to restrict, limit or curtail gas service in accordance with any of the provisions of this rule."

The regulation gives Kokomo the right to institute curtailments; it does not require that it do so. This reflects Kokomo's duty as a public utility to provide service to all its firm customers. As a public utility it cannot refuse service arbitrarily. To refuse present service to one group of firm customers on the ground that future shortages may impair its ability to serve another group would be arbitrary unless the future shortage were definite. *FPC v. Transcontinental Gas Pipeline Corp.* (1976), 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533. Moreover, the regulation states only that the utility may begin curtailment when *volumes* of gas are insufficient; it makes no reference to particular *sources* being insufficient. That there is a shortage of pipeline gas is definite. However, the petitions for purchase of supplemental gas show that a shortage in total gas available to the utility is not definite at the present time. Accordingly, Kokomo's position is that it will begin curtailment when it appears that all sources are insufficient to meet the needs of all customers, and within that, only when all sources are insufficient to meet the needs of residential customers will it consider the available gas from all sources dedicated to residential use. This can be seen in its priority system which does not require full curtailment in one category before instituting partial curtailment in a higher category. Further evidence of PSC policy in this regard is reflected in the fact that until 1975 Panhandle had purchased supplemental gas, the costs of which Kokomo tracked to all its customers, just as Kokomo's costs for propane have been tracked with PSC approval to all customers. Thus, neither the costs nor the uses for these other gases have been dedicated to one customer class by virtue of the curtailment regulations. Finally, we note that Kokomo's system of priorities was based on the impracticality of curtailing residential users and was unrelated to the rates charged.

### FPC Plan

By way of background, the jurisdiction of the FPC is encompassed in the Natural Gas Act which created the agency:

> "Three things and three only Congress drew within its own regulatory power,

delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." *Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana* (1947), 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128.

Increased state regulation of gas sales and distributions was a goal of the Natural Gas Act; thus resales and direct sales are not covered by the Act in order to permit their regulation by the states. *Panhandle Eastern, supra* at 516. However, curtailment plans (which do have a bearing on direct sales and resales) are within FPC jurisdiction because they regulate the *transportation* of gas, not its sale. *FPC v. Louisiana Power and Light Co.* (1972), 406 U.S. 621, 637, 92 S.Ct. 1827, 32 L.Ed.2d 369; *Panhandle Eastern, supra*, at 523. Curtailment deals with who shall receive how much gas, not the price at which it is to be sold. While sales to direct customers (both utilities and non-utilities) by interstate pipelines can be curtailed under an FPC plan, it is left to the state regulatory agency to set the rates for those sales. Similarly, any intrastate curtailment plans are left to state regulation. As Kokomo argues, this limited jurisdiction is evidenced by the FPC's rejection of part of an interim curtailment order prohibiting sales to suppliers when the end use of the gas would, in fact, be applied to lowest priority needs. The Commission reasoned that such a plan would affect intrastate distribution and might be contrary to state curtailment plans. While the Commission, in considering the interim plan, stated it "reserved judgment"[5] on its authority to institute a plan that affected intrastate curtailment, it is clear that at the time Order 467, which initially created the priority system, was promulgated, the FPC did not believe its authority was so extensive:

"Our decision is made with full knowledge that certain sales to ultimate consumers are beyond our jurisdiction. In those instances we solicit the cooperation of State authorities to aid implementation of this program." *Pacific Gas & Electric Co. v. FPC* (1974), 164 U.S.App. D.C. 371, 389, 506 F.2d 33, 51.

It is true that Opinion 754 did require reassessment of the 467–B priority accorded commercial customers who had alternate fuel sources in order to avoid contravention of its goal of preserving gas for highest priority customers. The FPC ordered the reevaluation even though the actual use of the gas may have partially resulted from local regulations. Nevertheless, in rejecting the interim plan's prohibition against taking gas for a category curtailed by Panhandle, the Commission found persuasive arguments against such control:

"This condition would require distributor adherence to the priorities in this curtailment plan when reselling Panhandle gas, despite any contrary provisions in local curtailment plans under which the distributors operate generally, or in the curtailment plans of other suppliers. Therefore, Panhandle and the Ohio Commission suggest that this Commission will be enbroiled unnecessarily in local curtailment problems whose solutions require a detailed awareness of local issues and factual situations. They also contend that [the interim] solution is premised upon a nonexistent uniformity among pipeline and local curtailment plans, and upon an assumption that we are in a better position to direct local affairs than local regulatory bodies . . . . [one gas company] suggests that the end-use limitation will force distributors to ignore their public interest obligations, as distinct public utility systems to serve their customers fully . . . ."

It concluded:

"The end-use requirements of ultimate consumers are examined to determine the distributors' volumetric entitlements under the pipeline curtailment plan; but the reallocation of that volume to the ultimate consumer may proceed in a dif-

---

5. Opinion No. 754, *supra*, CCH *Utilities L.Rep.*, paragraph 11,779, p. 13,689.

ferent fashion according to local regulatory requirements." Opinion 754, *supra*, CCH *Utilities L.Rep.* paragraph 11, 779, p. 13690.

The unwillingness of the FPC to interfere with local regulations is plain.

Nonetheless, appellants argue that priorities and rates go hand in hand, pointing to consideration given to the problem of prices to consumers in times of inflation by the FPC in Opinion No. 749, Docket R–476. Since the purchases here add to residential rates which have already incurred steep increases, it is urged that the orders are contrary to FPC intent. Appellants correctly assert that the FPC was concerned with costs to consumers in Opinion No. 749, which set area and nationwide rate ceilings on the costs of wellhead gas and allowed different prices for "old" versus newly-discovered gas. However, Order 467–B and Opinion No. 749 accomplished different purposes and dealt with different situations. Order 467–B was concerned with managing limited supplies; Opinion No. 749 set new prices to encourage more exploration and production of gas so that supply could be increased. The concern given in the latter order does not mean the FPC was trying to dictate local rates; rather it was trying to set a rate high enough to provide incentives for exploration without unduly burdening consumers (whether residential or industrial). It did recognize that increases at the wellhead would result in increases at the consumer level, but it did not establish limits as to what those increases might be. Order 467–B's only reference to costs is the statement that the FPC is ". . . cognizant of the economic impacts that will flow from that listing of priorities . . ." but must implement the program even so. Moreover, the "economic impacts" seem to refer to the impacts the program will have on those given low priority.

Furthermore, even if FPC jurisdiction were to extend as appellants suggest, the effect might not be the the one they expect. In *Mississippi PSC v. FPC* (5th Cir. 1975), 522 F.2d 1345, *cert. den.* 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976), a case illustrating the difficulty of equating priorities with rates, the court determined that the FPC did have jurisdiction to consider whether high priority users must compensate those with lower priorities for the added costs incurred by the latter in securing alternate fuels necessitated by curtailment. These compensatory payments were held not to be rates, but rather to be surcharges to assure that the curtailment program is *equitable*. The philosophy behind that language is not unlike the PSC's statements considered *infra* about the relative burdens among customer classes caused by the priority system. *See also Elizabethtown Gas Co. v. Federal Energy Regulatory Commission* (1978), 188 U.S.App.D.C. 4, 575 F.2d 885.

That is not to say that appellants cannot find support in Order 467–B or in Opinion No. 754. The intent of the orders is to assure adequate gas supplies for human needs purposes, and to the extent curtailed gas is diverted from those purposes, its spirit appears to be contravened.

Appellants are assured of sufficient gas. They insist that in addition to enough gas, they are entitled to the lower pipeline gas rates because they have the highest priority. In short, their argument is that lower rates and high priorities are two sides of the same coin. That conclusion cannot be drawn from either Kokomo's curtailment regulation nor FPC policy as it is reflected in Order 467–B or Opinions 754 or 749. The rates at which curtailed gas are sold are clearly beyond the scope of FPC jurisdiction. Although the FPC *may* have the authority to influence those rates indirectly by controlling intrastate distribution of pipeline gas, it has not attempted to exercise that authority in the regulations considered here.

*Burden of Curtailment*

Appellants also object to the PSC's finding that low priority status results in less reliable service to industries, forcing them to switch to alternate and more expensive fuels, or reduce their operating schedules, which in turn causes unemployment and other economic loss. Such a finding, appel-

lants argue, ignores equitable considerations in support of their position as well as the purposes of the priority systems. They claim that alternate fuels are available to industry, the costs of which are tax deductible and can be passed on to industry's product consumers. There was testimony to support those claims. There was also testimony that the costs of converting from gas to alternate fuels are high; that alternate fuels are either unusable or substantially inferior to natural gas in some manufacturing processes; and that there comes a point where increasing the price of products results in pricing them beyond competitive levels. It is noteworthy that neither side carried this further to observe that product price increases spread the burden of gas purchases across the community, to those who do not rely on gas at all. Appellants further argue that by using the curtailment program to show one class of customer bears a burden greater than another, Kokomo and the industrial customers are making a collateral attack on the program. However, appellants cannot have it both ways. They cannot assert the program entitles them to pay lower charges for gas and at the same time prohibit other customers from showing they are burdened by the same program.

Although rates and priorities are not interchangeable, the rates charged to each class must bear some relationship to a benefit received. Therefore, it is necessary to determine whether residents do receive a benefit from these purchases.

### Rate Making Context

All parties argue the issues within the rate making context. By doing so even appellants tacitly recognize that Kokomo is not ignoring the safety of residential users. Kokomo is taking steps to assure that their heating and cooking needs will be satisfied by requesting permission to make these purchases. The issue is whether requiring the class which forms the basis for delivery of FPC gas to help pay for supplemental gas purchases is just and reasonable.

Appellants contend that the orders violate the 14th Amendment to the U.S. Constitution and Article I, §§ 12 and 21 of the Indiana Constitution. They maintain that by charging the costs of supplemental gas to all customers, the PSC is benefitting industrial customers at the expense of residential customers because the costs of this gas are solely attributable to serving industry. They urge the orders constitute a "taking" from one group to benefit another by a public authority. Appellants also maintain that the orders violate IC 8–1–2–4 in that they are unjust and unreasonable by virtue of discriminating between classes of customers. In the briefs the parties make no distinction between the statutory standard of "just and reasonable" and the Constitutional limitations on rate-making, and we agree that the statute incorporates or parallels the Constitutions' standards.[6] Rates and classifications among customers cannot be arbitrary nor discriminatory in the sense of imposing a burden or creating a class in a manner not rationally related to the purposes of regulations.

### Traditional Analysis

As appellants frame the issue, the costs of supplemental gas should not be rolled in because they are attributable solely to serving industry. Whether this is true is in issue here, but it must be remembered that cost of service per se is not the issue in this case. Kokomo's rates were constructed on the assumption that historic volumes of pipeline gas would be available at historic price levels even though it knew of the shortage and curtailment plan. At the risk of oversimplification, it may be said that Kokomo's rates are based on the cost of serving each class. The substitute and supplemental gas costs come *on top of* or as an addition to cost of service in its basic mean-

---

**6.** The Natural Gas Act has the same standard ("just and reasonable") which the United States Supreme Court found ". . . 'coincides' with the applicable constitutional standards." *In re Permian Basin Area Rate Cases* (1968), 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312, reh. den. 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379.

ing.[7] However, the argument urged by appellants, that this gas represents cost of serving industry, points up the underlying issue. Thus, they object to the establishment of rates without reference to the costs of supplemental and substitute gas. The reason for setting the rates as was done seems clear. Prices for supplemental and substitute gas fluctuate over time. In fact, the prices for the two purchases in issue are different. Prices for substitute gas are far greater than for supplemental gas. Had rates been predicated on making up the Panhandle deficit from substitute gas only, they would have been excessive in view of the opportunity which arose to buy supplemental gas. Moreover, the amounts of gas needed and available to make up the deficit cannot be precisely known in advance. Thus, it was not possible at the time of setting base rates to accurately determine what to add for non-pipeline gas purchases. Rates cannot be based upon "hypotheses;" they must be based on facts in existence. *PSC v. City of Indianapolis* (1956), 235 Ind. 70, 91, 131 N.E.2d 308.

Rates, whether viewed technically as based on cost of service or, as here, as an addition to cost of service, must reflect a relationship to service or a benefit provided in order not to be unreasonable or to discriminate unduly among classes. Rolled in rates assume that while each customer may not receive identical benefits, each receives some benefits from being a part of the entire system. However, when it is clear that only one group benefits, that group alone should bear the cost and the rates must be "incremental" rather than rolled in to reflect that cost. There are no cases on point in Indiana, but analogies can be drawn to situations involving other utilities or public services. In *Brandel v. City of Lawrenceburg* (1967), 249 Ind. 47, 230 N.E.2d 778, the court upheld a sewer hook-

up charge for residents of a newly developed area that was substantially in excess of the charge paid by residents served in an older area. The new sewer line had cost more to build and the charge, therefore, was reasonably related to cost. Similarly, in *Roundenbush v. Mitchell* (1900), 154 Ind. 616, 57 N.E. 510, land which had not been assessed for the construction of a drain because it was not immediately benefitted by the construction was properly assessed for the drain's maintenance because it did and would in the future derive a benefit from the existence of the drain.

Cases from other jurisdictions directly involving the issue of rolled-in costs identify the concept of benefit more clearly. For example, in *Battle Creek Gas Co. v. FPC* (1960), 108 U.S.App.D.C. 209, 281 F.2d 42, a pipeline petitioned the FPC for permission to expand its capacity in order to get gas to one new customer and to allocate the entire costs of the expansion to that customer. The expansion was permitted but the FPC ordered that the cost be tracked to all the pipeline customers. The Court of Appeals agreed, noting that the gas for this one customer was commingled with other pipeline gas. In addition, the expansion provided for non-exclusive use for a two year period during which the pipeline would be able to make other cheaper expansions for the benefit of all customers. The court pointed out that use of rolled-in pricing was somewhat disadvantageous to other older customers since they must share the cost of equipment for newer customers and receive in return "little visible increase in service." However, rolling in recognizes that a pipeline ". . . is not just a collection of discrete pieces and parts, but an integrated system of serving all of its customers." *Battle Creek Gas Co., supra*, 108 U.S.App. D.C. at 213, at 46. The court distinguished

7. The cost of serving each class varies because of differences across classes. Residents as a class are more expensive to serve because their large numbers require more equipment, meters, billings, service repair calls, etc. The revenue generated by class should total enough to reimburse the utility for its costs and provide a reasonable rate of return for its investors. This method of assessing rates has been the predominate one. *See, e. g.*, J. Bonright, *Principals of Public Utility Rates*, Columbia University Press, New York & London, 1960; *see FPC v. Sierra Pacific Power Co.* (1956), 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388, for a discussion of reasonable rates.

*The Montana Power Co.* (1952), 11 FPC 1 where a new pipeline had to be built solely to provide more gas for one customer. In that case, even though the new line fed into the existing pipeline and the gas was, therefore, commingled, the cost was placed entirely on the one customer because the amount of gas that customer was permitted to take was expressly limited by the FPC and the foreign government regulating the supplier.

The concern with spreading costs across customers in order to keep prices as low as possible and to reflect the benefit to all customers in terms of more reliable service if all sources of gas are available to all customers can be seen in other contexts. In the *Permian Basin Area Rate Cases* (1968), 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, *reh. den.* 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379, the prices producers could charge for gas were based not on their individual costs, but upon area-wide determinations. Following *Permian* the Supreme Court in *Mobil Oil Corp. v. FPC* (1974), 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72, affirmed the Fifth Circuit's [8] refusal to strike down an FPC order which allowed companies that had collected excessive rates to avoid refunds if they used the excess for exploration and increased production. Companies which had already made refunds objected that the order unjustly discriminated against them. In supporting the FPC, the Fifth Circuit stated, "We will not reject an administrative decision merely because one producer's cake is iced and another's is not. The crucial factor . . . is that both get some cake." *Placid Oil Co. v. FPC, supra* at 905.

That is the case here. The supplemental gas was purchased primarily for the benefit of non-residential customers; if the addi-

tional purchases had not been made, industrial customers would have been curtailed. Residential customers would not necessarily have been curtailed in the absence of purchases of additional gas. However, residential customers *do* receive benefits from the purchases. It is apparent that without the storage opportunity provided by the purchases, it would have been necessary to curtail residential use on peak days. Moreover, peak days result largely from "heat-sensitive" residential customers who need more fuel on cold days than they do on warm ones.[9] Industrial customers, on the other hand, have a fairly consistent demand year-round as their use of gas is not limited to the generation of heat for comfort, but is used primarily in the manufacturing process.

Further, as is contended by appellee, when Kokomo received Panhandle's curtailment notice, it had two choices: to buy more gas or to increase its rates.[10] As stated above, rates are based on revenue needed to cover costs. If Kokomo were to provide only the smaller quantity of gas available to it from Panhandle, that smaller quantity sold at the original rate would provide insufficient revenue to meet its costs. Therefore, it would have had to petition for a rate increase which can only be assumed to have had a substantial and adverse effect upon all residential customers. Of course, election of that option would have neglected the needs of Kokomo's industrial customers and the impact of the curtailment on the community.

It must also be remembered that if the supplemental gas had not been purchased, Kokomo would have used substitute gas at a cost 2½ times greater than supplemental gas. The substitute gas costs would have

---

8. *Placid Oil Co. v. FPC* (5th Cir. 1973), 483 F.2d 880.

9. Neither party makes reference to the fact that Panhandle's curtailments are based on historical volume demands. Unusually cold winters such as the one just past, might require use of supplemental gas for residents even if all other categories were curtailed.

10. While this is undoubtedly one of the ironies of public regulation, the fact remains that the utility is entitled to recover costs and fair return upon the service it provides. Thus, if service is greatly curtailed the rates for remaining customers wi'l be increased to recognize the narrower base for spreading fixed costs and fair return. There is, therefore, a very real, though indirect, benefit to residential customers in maintaining a broad customer base.

been tracked to all customers; thus, in terms of these particular appeals the supplemental purchase results in a very substantial savings to residential users. In addition, had Panhandle made these purchases, the costs would have been tracked to all customers. To require a different result as a matter of law when Kokomo makes the purchase would be incongruous and inconsistent.

Tracking costs to all customers is, therefore, reasonable because all customers benefit from the purchase. The orders are not in violation of either the 14th Amendment or Art. I of the Indiana Constitution.

### Conservation Analysis

While allocating costs to all customers may be reasonable in times of plentiful supply, the argument is increasingly made that in times of dwindling supply, costs and their allocation should be analyzed from a different reference point. The current shortage of natural gas results in part from previous FPC policy. That policy was to protect consumers from monopolistic pricing and other anti-competitive practices by regulating pipeline distributors in order to keep prices down. *Phillips Petroleum Co. v. Wisconsin* (1954), 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 extended FPC jurisdiction to producers as well as distributors. By that time, the gas industry as a whole was already intensely competitive; therefore regulation of producers pushed prices *below* competitive levels.[11] That, in turn, destroyed incentives to explore for and produce new gas. In fact, ". . . contracts for new reserves were written throughout much of the entire decade [1960's] as if economic conditions had not changed since the late 1950's."[12] In part this policy reflected a desire to pass savings on to consumers rather than allow windfall profits to producers who might be able to provide gas at lower than competitive prices.

Because regulation of individual producers proved cumbersome, the FPC began regulating on an area-wide basis in the 1960's. The area rate cases, of which *Permian, supra,* is typical, set two rates for gas, the higher one for newly discovered gas in order to encourage exploration. However, the demand for lower-priced gas encouraged direct sales which are unregulated by the FPC. The result of *Permian* was that "[W]hile the Commission may have intended the price of new gas to be set at market-clearing levels, the methods it used for setting new gas area prices made it highly likely that a significant gas shortage would arise by virtue of the new gas price—the "high" price—being set below the long-term costs of natural gas production.[13]

The impact of this shortage has been greatest on the residential, not the industrial customer. Less than half of the volume of new gas reserves developed after 1965 was received by regulated pipelines.[14] Between 1962 and 1968 total industrial consumption of gas from unregulated intrastate pipelines increased 43.5%; intrastate pipelines increased their industrial sales by 62%.[15] Because they were not burdened by unreasonably low price ceilings, unregulated pipelines could easily outbid FPC jurisdictional pipelines for new reserves. While residential customers have benefitted in one sense by paying very low prices in the past, they have suffered by virtue of losing "future" reserves to intrastate producers who supply industry.

These factors have pushed the "future" into the present and all users are feeling the effects of shortfalls in gas availability. States, through their regulatory agencies, are reviewing rate structures with an eye to ascertaining how reasonable rates can be which encourage consumption in a time of shortage. Language similar to the following is appearing with greater frequency in court and agency decisions:

11. Breyer and MacAvoy, *The Natural Gas Shortage and the Regulation of Natural Gas Producers,* 86 Harv.L.Rev. 941 (1973).

12. *Id.* at 958.

13. *Id.* at 961.

14. *Id.* at 977.

15. *Id.*

"The old notions of rate making, which prevailed before the energy crisis, sought to maximize energy sales and encourage even greater energy consumption. Now that a true energy crisis is upon us, we would be surprised to find this continues to be a goal. . . . [C]onditions might no longer exist for necessarily favoring large users with low rates." *Allied Chemical Corp. v. Georgia Power Co.* (1976), 236 Ga. 548, 224 S.E.2d 396, 400.

and:

"In a time of rapidly rising natural gas prices and increasingly severe nationalwide shortages, any proposed utility rate schedule which is not supported by acceptable cost justification or other demonstrable rational basis to support it should be discarded for a rate schedule which is as nearly as is practicable to an equal charge by volume for each volume category of usage within or between each class of customers." *Re. The CutBank Gas Co.* (Ohio 1975), 12 P.U.R. 4th 106.

As a result, in rate setting proceedings the "declining tail block" rate (the more consumed, the lower the charge per unit of gas) has been if not abandoned, at least diminished in impact.

As is the case with Kokomo's present rate structure, "flattening" or bringing rates to large volume users in line with residential users has been upheld in various jurisdictions ". . . to reflect *the societal costs* as well as the utility costs of waste." [16]

These rate setting actions, as well as the FPC's Order 467, recognize that setting low rates for gas encourages over-consumption of a finite resource which is available now in ever-decreasing quantity. Order 467 and its amendments clearly indicate that waste is to be avoided. Thus, gas which is to have an end use as a fuel for boilers in order to generate other forms of energy is given the lowest priority among firm customers because other, albeit more expensive, fuels are

available for use in energy production.[17] Industries not possessing the capability to switch to alternate fuels are given a higher priority. Whether or not an industry can switch to another fuel is not determined by the costs of doing so, but rather by whether a substitute fuel is capable of serving the same purpose as natural gas.

Cost, therefore, is becoming a subsidiary issue to energy conservation—or gas' intrinsic value—in determining the reasonableness of rates. In *Allied Chemical Corp., supra,* the Georgia Supreme Court upheld new rates which increased the contribution from industrial users to the utility's rate of return by 40% but only increased residential contributions 20%. The rates were upheld on the ground that the gas shortage required a retreat from rates that favor large consumers. Similarly, *CutBank, supra,* rejected across the board percentage increases in rates because that would not bring about the "flattening" necessary to promote conservation. In *Application of Arkansas Louisiana Gas Co.,* n. 19, *supra,* at 378, a rate increase which was borne in largest part by industry was upheld because the increase in effect allocated greater volumes ". . . of a dwindling resource to 'human needs' uses . . . thereby discouraging inefficient and wasteful *over consumption* of natural gas reserves where alternative fuels can be substituted." (Emphasis added)

The Michigan PSC approved separate and distinctly higher rates for geographically diverse customers with one distributor in *Re. Michigan Power* (1975), 12 P.U.R. 4th 139. While grounding its decision on the facts that each geographic area received different gas from different pipeline suppliers which could be used only by its residents and that the actual cost of gas from one supplier's pipeline was higher than from the other, the Commission pointed out:

16. *CutBank* at 109. *See also Application of Arkansas Louisiana Gas Co.* (Okl.1976), 558 P.2d 376; *Allied Chemical Corp. v. Georgia Power Co.* (1976), 236 Ga. 548, 224 S.E.2d 396; *Application of Arkansas Louisiana Gas Co. v. Sun Oil Co.* (Okl.1976), 554 P.2d 14.

17. The same trend seems to be occurring with electric rates; *see* Smith, *The Developing Direction of Electric Rate Structures,* 98 Pub.Util. Fort. 28 (1976).

"[A]dditionally, potential customers in the eastern portion should be made aware—through the price mechanism—of the true cost of providing service to them, so that decisions which are economically rational can be made." 12 P.U.R. 4th 139, 153.

The intrinsic value of gas is being defined not as equal to the cost of providing it to the ultimate consumer but as its worth compared to the "per energy unit costs of alternative fuels."[18] Acceptance of this concept is reflected in "fuel adjustment clauses" which allow electric utilities to pass on to ultimate consumers the costs the utility incurs in obtaining alternate fuel with which to generate electricity.

Several jurisdictions have gone beyond rate flattening in efforts to conserve gas. In *Re. Southern California Gas Co.* (Cal. 1976), 14 P.U.R. 4th 498 (*SoCal*) the California Public Service Commission indicated approval of an inverted rate structure as an ultimate goal. Under such a system, highest priority customers pay the lowest rates; conversely lowest priority customers must buy their gas at the highest rates. In operation this, of course, is completely contrary to traditional rate-making philosophies. Further, the California legislature has mandated the Commission to establish "lifeline" volumes; that is, to determine the "minimum energy needs of the average residential user." *SoCal, supra,* at 503. Two rates will then be set; one for the lifeline volume and a higher rate for all other volumes.

In *SoCal* at 502, the Commission determined that neither rolled-in nor incremental pricing reflect true costs as neither asks the proper question: "Which customer classes are most likely to conserve in response to prices?" Borrowing from theoretical economics, the Commission reasoned that groups with the least elastic demand would be least able to alter purchasing practices.

These groups, obviously, are residential consumers who must purchase gas regardless of price because alternate fuels are beyond their reach.[19] However, industrial customers can convert to other fuels. Therefore, it is most reasonable to set rates that are highest for largest volume consumers.

In *The Institute of Shortening and Edible Oils v. Illinois Commerce Commission* (1977), 45 Ill.App.3d 98, 3 Ill.Dec. 821, 359 N.E.2d 231, a rate increase designed to force interruptible large users to turn to alternate fuels so that *potential* residential customers would be assured of adequate gas supplies was upheld. The large volume users here were interruptible customers who had the lowest curtailment priority. Rather than cut off interruptible customers entirely, the Commission created a new class into which they could elect entry if they were willing to pay much higher rates. The Commission reasoned that those interruptibles who could afford it would pass up this option and convert to another fuel. In finding this to be a reasonable decision, the court stated:

"If a class of users can be denied gas completely in order to serve a public policy of making gas available to another class . . . ., it is neither unjust, unreasonable nor discriminatory to those in the lowest priority class to raise their rates to the point that those who can most easily *do so, will convert to another form of fuel.*" 45 Ill.App.3d 98, 3 Ill.Dec. 821, 826, 359 N.E.2d 231, 236.

In a similar vein, the FPC ordered incremental pricing at the pipeline level for certain imported gas to be used by lowest priority customers.[20] Opinion No. 622–A, 48 FPC 723 (1972). Although adoption of the incremental system was not without dissent, the majority urged that if the costs were rolled in, high priority users would

---

18. *Mississippi PSC v. FPC, supra,* at 1347.

19. There appears to be implicit in these assumptions the same value judgment as to the inherently desirable characteristics of natural gas (other than cost) for residential uses.

20. However, the FPC reversed itself on requiring incremental pricing by the distributors to *their* customers because of difficulties in administering such a rate schedule. The decision to require the pipelines to price gas incrementally to their customers (the distributors) was upheld.

end up subsidizing low priority users because without the imported gas, low priority users would have been curtailed. The Commission added that ". . . it is not economically rational to sell a product over an extended period of time for less than its full costs. To do so necessarily results in a greater demand . . . than can be justified in terms of the resources . . . expended in making it available, and a greater demand than would exist if the product were priced to cover its full costs." 48 FPC at 736.

If the issue of who should bear the cost of the supplemental gas purchases were analyzed not in terms of whether any customers receive some tangential benefit from the purchase, but rather from the perspective of conservation, the issue should be resolved in favor of appellants.[21] Any other decision encourages large users to continue their traditional dependence on gas because no sufficient incentive to conserve is given. Industrial customers will see no need to switch to alternative fuels if they can continue to purchase natural gas at unrealistically low levels. In fact in the present cases there was testimony that one large industry which had created the capacity to switch to other fuels has been relying on gas in recent years. In the absence of necessity, there is no reason to expect anyone to conserve. Economic pressure should have an effect on small users as well. As prices go up, residents will be more likely to conserve. However, there comes a point at which they can use no less; minimal consumption is essential for home and health protection.[22] Industry can be forced to switch to alternate fuels by raising prices of gas to the point where it is cheaper to abandon reliance on gas. There may be assistance to cushion the costs of conversion in the form of funding through the sale of tax free development bonds.[23] Further, it is possible that the added fuel costs could be passed to industry's product consumers and deducted from taxes, thereby lessening the real cost of conversion. Those options are unavailable to residential customers, who therefore cannot be expected to conserve in the sense of abandoning gas as a fuel. They can be required to conserve only up to the level required for minimum protection—the so-called lifeline levels discussed in *SoCal, supra.*

Seen in this light, it is unreasonable not to charge the primary beneficiary of supplemental gas purchases with their costs. To do otherwise signals large consumers to continue or exceed their present consumption patterns.

## CONCLUSION

All the cases cited in support of the "conservation analysis" are either commission opinions or court decisions upholding commissions on appeal. In the latter, the courts merely had to find that the opinions were not unreasonable because the commissions had related the issues to a different context—conservation rather than costs and benefits. The PSC has worked within the traditional context in arriving at its decision. It is not for this court to set aside a commission ruling simply because it disagrees with the method by which the commission arrived at its decision: ". . . it is the result reached and not the method employed which is controlling. It is not the theory but the impact of the rate order which counts." *FPC v. Natural Gas Pipeline Co. of America* (1942), 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037. Or, as stated in *L. S. Ayres & Co. v. Indianapolis Power and Light Co.* (1976), Ind.App., 351 N.E.2d 814, rate-making decisions are intended by statute to be within the commission's special expertise. The standard of review, therefore

---

**21.** Such a resolution does not rest on a theory of cost allocation according to ability to pay, a theory which appellees attribute to appellants.

**22.** The dilemma occurs in part because the purpose is to deter waste but to nevertheless fully utilize the resource.

**23.** *See, e. g.,* IC 18–6–4.5–1 et seq. Kokomo has an Economic Development Commission.

". . . does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision. Our function . . . is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factor and was reasonably related to the discharge of its statutory duty." 351 N.E.2d 814, 830.

Although we regret that the Commission did not consider in detail the conservation analysis and the allocation of supplemental gas costs from the perspective of rates best designed to promote conservation of gas and the well-being of those least able to use other fuels, the decision of the Commission must stand. Confronted with arguments over the economic wisdom of an FPC decision, the United States Supreme Court demurred:

"For the Court to step outside its role in construing this statute [Natural Gas Act], and insert itself into the debate on economics and the public interest, would be an unwarranted intrusion into the legislative forum . . . ." *FPC v. Texaco, Inc.* (1974), 417 U.S. 380, 401, 94 S.Ct. 2315, 2328, 41 L.Ed.2d 141.

As the Commission found, the supplemental gas is commingled; it will be used by residents. Its purchase is essential to serve residential customers on peak days. This gas merely replaces much more expensive propane, the costs of which would have been tracked to all users on the basis of an earlier unchallenged PSC order. The supplanting of substitute for supplemental gas produces a real benefit to residential customers by providing the same quantity of gas at a much lower price than they would otherwise have had to pay. Had Panhandle made the purchase, the costs would have been tracked to all customers. Finally, purchase of the supplemental gas enabled Kokomo to avoid curtailments which would have resulted in increased charges to residential consumers through the cost plus return mandates of the rate statutes.

Accordingly, the Commission's actions were not unreasonable. The decisions are affirmed.

ROBERTSON, J., concurs.

Dissenting Opinion by STATON, J., to follow.

STATON, Judge, dissenting.

I dissent. The rate policy adopted by the Commission is not supported by sufficient evidence to establish a just and reasonable rate.

The rate policy question before the Commission is whether tracking or "rolling-in" the cost of supplement gas maintains a just and reasonable rate for all classes of Kokomo ratepayers. This rate policy question is so crucial to the public interest that the Commission acknowledged its *ad hoc* nature:

"14. *Future Supplemental Gas Purchases.* This Commission stated in its Order entered November 26, 1975, in Cause # 34303, and reiterates in this finding, that this Commission has been acutely aware for some time of the nationwide shortage of natural gas in relation to the demand for such gas. During this period of shortage, Petitioner should make the best possible utilization of its historical source of gas. It should also be alert to the possibilities of supplemental sources of gas appearing, *in futuro*, and be prepared to take advantage of such sources. Towards this end, whenever the public interest shall be served, this Commission stands ready to give its approval in such matters.

"We think that the public interest, however, would best be served in the forseeable future by the individual treating of each such future supplementary purchases, if indeed future purchases become available. By individual treatment we mean the customary formal proceedings which include, *inter alia*, public hearing, submission of evidence, cross-examination by the Office of the Public Counselor and any intervening parties, and the right of any member of the public at

large to give testimony for the record. Therefore, our Order herein is applicable only to the instant proceedings and is not intended and should not be construed as authorization for any future purchases of supplemental gas." Order of the Public Service Commission, Cause No. 34471, Approved March 24, 1976.

In addition to the *ad hoc* nature of the rate policy decision to be made in each purchase of additional supplemental gas, the Commission concedes the unusual circumstances of a "nationwide shortage of natural gas." Yet, the evidence does not support the decision of the Commission that usual methods of recovering the additional cost of supplemental purchases should be used.

The evidence does show that Kokomo has a sufficient supply of low-cost pipeline gas to serve residential ratepayers except on a few peak days. The primary need to purchase expensive supplemental gas is to avoid any curtailment of gas service to industrial ratepayers. Residential ratepayers use 38.2% of Kokomo's gas supply while the industrial ratepayers use 46.8% of Kokomo's gas supply. However, the percentage of total revenue from residential ratepayers is 46.9% while the industrial ratepayers percentage of total revenue is only 37.8%.

One reason given by the Commission for adopting the usual "tracking" method of recovering cost is that the supplemental gas is commingled with the pipeline gas. However, there is no evidence that rates are impossible to adjust when different gases are commingled. There is no evidence that reliable service cost which is incurred by substantial shortages of gas supply could not be translated into adjusted rates among classes of ratepayers. Here, the additional supplemental gas purchases are being made primarily to provide reliable service to one class while a "nationwide" gas shortage exists. This one class, the industrial ratepayer, uses almost half of the total supply distributed by the utility, Kokomo Gas.

Another reason given by the Commission for adopting the "tracking" method is the additional burden that would be placed upon the industrial ratepayer if the cost were added to the present industrial rate. In Finding "15" the Commission recites that the industrial ratepayer "who is subject to curtailment is already bearing the costs of alternate fuel capability and facing reduced operating schedules, which could cause economic hardship and resulting loss of employment . . . We find it would be inequitable and discriminatory to impose the total additional cost of supplemental supplies of gas solely upon the very class of customers who are already bearing the economic burden of curtailments." However, there is very little evidence in the record which reflects the extent of this burden so that it could be equated in equitable terms.

There is not sufficient evidence to support the conclusion of the Commission that just and reasonable rates have been established by using the "tracking" or "rolling-in" method in this particular purchase of supplemental gas by Kokomo Gas. I would reverse and remand for further hearings.